**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-84 (PLF)** |
| **CODY PAGE CARTER CONNELL &** **DANIEL PAGE ADAMS,** | |
| **Defendants.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

*It was a fight at the beginning[.] Me and my cousin led the charge. We were the first ones in.*
*-Daniel Page Adams, January 6, 2021*

Cousins Cody Connell and Daniel Adams did indeed lead the charge of the rioters on the Northwest side of the United States Capitol on January 6, 2021. They opened the Northwest Stairs, harnessing the mob and assaulting outnumbered officers until they retreated. They opened the Senate Wing Doors, becoming two of the first rioters to enter the Capitol. And they opened a path into the seat of government that hundreds of other rioters used the rest of that day to halt the transfer of presidential power. They *knew* the role they played. They also presented a danger moving forward: Connell planned to return to D.C. with firearms and body armor on Inauguration Day, and he was not going home unless it was in a "body bag." They were both arrested on January 16.

Following a stipulated bench trial on July 28, 2023, this Court convicted both defendants of, *inter alia*, violations of 18 U.S.C. § 1512(c)(2) (obstruction of a Congressional proceeding), 18 U.S.C. § 111 (assault of police officers), and 18 U.S.C. § 231(a)(3) (impeding police officers during a civil disorder). As explained below, the government has calculated Connell's advisory Guidelines range at 46-57 months, and Adams' range at 51-63 months. The government recommends that this Court sentence both Cody Connell and Daniel Adams to 51 months of

1

incarceration, three years of supervised release, $2,000 in restitution, and a mandatory assessment of $360. Such sentences would be sufficient but not greater than necessary to reflect the seriousness of the defendants' conduct while also acknowledging their acceptance of responsibility.

## I.   INTRODUCTION

The defendants, Cody Page Carter Connell and Daniel Page Adams, are cousins from, respectively, Louisiana and Texas. Together, they participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

## II.   FACTUAL BACKGROUND

### A.   The January 6, 2021, Attack on the Capitol

The government refers the court to the Stipulated Statement of Offense in this case, ECF 100, for a summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

**B.**     **The Defendants' Role in the January 6, 2021, Attack on the Capitol**

    *1.*   *Defendants' Travel to Washington D.C. and Early Morning Activities on January 6, 2021*

On January 4, 2021, Adams, a resident of eastern Texas, posted a public status on his Facebook account: "Who on here is going to DC to protest? Hiding behind your phones posting memes won't get anything done." Connell, Adams' cousin, replied that he was interested and the two began to make plans to travel to Washington, D.C. On the morning of January 5, 2021, Adams picked Connell up at Connell's home in central Louisiana.

Around that time, Connell messaged another individual on Facebook, "we got a back pack for food and supplies [because] everything in downtown is already shut down.  Two flags three pistols and black hoodies so we fit in if ahit [*sic*] goes south." Together, they drove from Trout, Louisiana, into the early morning hours of January 6 before stopping in southwest Virginia, to rest briefly at a Quality Inn & Suites. Just after 5:00 a.m., Adams posted another public status to Facebook: "Getting a few hours sleep. Sounds like the protest is gonna be eventful. Glad I got my cuz Cody Connell with me."

Connell and Adams then drove to Springfield, Virginia, where they parked and rode the Metro blue line into downtown D.C. Upon arriving in D.C., Adams and Connell went to the area on the National Mall near the Ellipse where the former President was hosting the "Stop the Steal" rally. In D.C., the pair begin to document their activities, taking pictures of the rally and the area around the National Mall. Together, they posed for a photograph which Adams posted to his Facebook account. *See* Figure 1.



*Figure 1. Adams is at left, dressed in the camouflage jacket, brown pants, and purple shirt (identified throughout in yellow). Connell is at right, dressed in blue jeans and a gray Carhartt hooded sweatshirt with distinctive tattoos on his hands (identified throughout in red).*

Adams and Connell stayed for a significant portion of the "Stop the Steal" rally and were present for at least some of the former President's speech to the crowd. After the rally, they began moving east in the direction of the United States Capitol where a large crowd was amassing and agitating against police officers who stood between the mob and the Capitol.

2. *Connell & Adams Lead the Charge Up the Northwest Stairs and Assault USCP Officers*

In many ways, the West Front of the United States Capitol was the focal point of much of the rioters' violence on January 6. It was there that the police officers who fought to protect the Capitol endured the fiercest and most sustained assaults by the mob. It was also the scene of some of the most serious breaches of the police lines and the building itself. In the crucial minutes leading up to the first breach of the building through the Senate Wing Doors at 2:13 p.m., a series

of events happened in rapid succession.

Rioters breached the secure perimeter around the Capitol by pushing past and through police officers at the Peace Circle at 12:55 p.m. Between 12:55 p.m. and 1:15 p.m., United States Capitol Police ("USCP") officers, with the assistance of newly arrived Washington, D.C., Metropolitan Police Department ("MPD") officers, worked to re-establish a defensive line in the West Plaza of the Capitol complex. For approximately thirty minutes, this police line held even as officers were being assaulted by members of the mob, which was growing increasingly violent.

At 1:48 p.m., a group of rioters pushed through the small group of USCP officers who were standing at the base of the Northwest Stairs, around which a scaffolding structure had been constructed to hold up the grandstands for the upcoming inauguration. The mob quickly moved into the scaffolding. At 2:08 p.m., a group of rioters charged against the group of police holding them at bay on a landing of the Northwest Stairs. Five minutes later, after overwhelming another line of officers and a barricade of bicycle racks, the mob breached the Senate Wing Door and rushed into the Capitol building. At nearly all of these crucial moments, Connell and Adams were at the front of the battle eagerly participating in the riot and rallying others to do the same. They were, effectively, the tip of the mob's spear in that area of the Capitol.

After moving from the rally to the West Front of the Capitol, Connell and Adams made their way to the front of the crowd. Once the rioters overwhelmed the officers at the base of the Northwest Stairs, the crowd, including Connell and Adams, began to flow into the area underneath the scaffolding, with rioters continuing to push up the stairs and climbing into the structure of the scaffolding. At approximately 2:00 p.m., while Connell and Adams were underneath the scaffolding, Connell posted a picture of himself and Adams to his Snapchat account, adding, in

reference to the police: "They tear gassing us[.]"   *See* Figure 2.



*Figure 2.   Connell (red) is in the foreground of the image with Adams (yellow) immediately behind him.*

After rioters breached the base of the Northwest Stairs, USCP officers retreated to a wide landing at the midpoint of the stairs. Approximately seven officers, including USCP Officers J.G., T.M., B.S., B.M., and J.D., stood against the hundreds of rioters who were yelling at them, threatening them, throwing objects at them, and spraying them with chemical irritants. At 2:08 p.m., Connell and Adams were at the very front of the crowd of rioters on the Northwest Stairs standing mere feet away from the officers who were holding the mob back. *See* Figure 3.



*Figure 3.*



*Figure 3 (detail). Connell is indicated with the red arrow and Adams is indicated with the yellow arrow.*

From their position at the head of the mob, Connell and Adams could see that the officers were being harassed and assaulted by the crowd. Rather than turning around upon seeing officers under assault, Connell and Adams pressed ahead.

The two USCP officers who were standing immediately in front of Connell and Adams were holding up two riot shields to keep the rioters at bay. Adams, seeing his way blocked by these officers with shields, looked to the other rioters around him and said, "Let's go. Are you ready to

push? You ready to push?" On Adams' signal, the crowd began to push against the officers with shields, who, for approximately five seconds, were able to resist the push of the crowd. In the first seconds that the crowd began pushing against the officers, Adams harassed the officers, shouting, "Hey, you're not even a fucking American!" But, Adams stopped his invective mid-breath when he saw an advantage had opened: a rioter standing immediately behind Connell and Adams had sprayed a stream of chemical irritant over the shield of one of the officers, striking the officer in the face and causing him to buckle, stumble sideways, and momentarily lower his shield. *See* Figure 4; *see also* Gov. Ex. 4 at 00:46-00:48.



*Figure 4. The officer who a rioter sprayed with chemical agent is circled in blue.*

Taking full advantage of that opening, Adams yelled to the crowd, "Let's go! Let's go! Let's go!" With the force of the crowd behind them, Connell and Adams crashed into the officers and began to push against them, exploiting the momentary gap in the police line. The officers on the stairs, including the one who had just been sprayed in the face, attempted to push back against Adams, Connell, and the rioters who were following Adams' commands.   But those officers had to retreat in the face of the rioters' substantial numerical advantage and superior physical force.

*See* Gov. Ex. 4 at 00:43-00:50; *see also* Gov. Ex. 5 at 00:00-00:14. With the police line broken, Adams pursued the officers up the stairs, with Connell following a few feet behind. *See* Figure 5.



*Figure 5. Adams is circled in yellow; Connell is circled in red.*

The rest of the crowd followed behind them. As a result of Adams' and Connell's actions, after being bottlenecked on the stairs and inside of the scaffolding, the mob was now able to flow *en masse* towards the final barricade and line of officers that stood between them, the Northwest Courtyard, and the Senate Wing Door beyond it. *See* Gov. Ex. 6 at 38:45-41:00.

As he ran up the stairs with the crowd following behind him, Adams continued to exhort his fellow rioters with guttural yells and shouts of, "C'mon! Let's go! C'mon!" Adams continued his charge up the stairs and into the courtyard even after a police officer attempted to slow his progress by striking him in the head with a baton. Gov. Ex. 5 at 00:39-00:43.

Connell and Adams briefly paused at the top of the stairs while Adams assessed the wound to his head. *Id.* at 00:42-00:45; *see also* Gov. Ex. 6 at 40:33-40:36. While Connell and Adams

paused, the crowd passed them and confronted yet another group of USCP officers at a barricade that led into the Northwest Courtyard. Due to their strength of numbers, the crowd quickly overwhelmed these officers and the barricade. Within minutes, the Northwest Courtyard, which been breached at approximately 2:11 p.m., filled with hundreds of rioters. Gov. Ex. 6 at 39:40-40:10. Connell and Adams again made their way to the head of the mob that was rapidly approaching the Senate Wing Door.

### 3.   Connell & Adams Breach the Senate Wing Door

The mob charged across the Northwest Courtyard and by 2:12 p.m. was directly outside the Senate Wing Door. Just as they had been for the entirety of the charge up the stairs and into the courtyard, Connell and Adams were at the front of the line of rioters. Adams recorded himself, blood streaming down his head from the baton strike and watching other rioters kick and shatter the windows on both sides of the Senate Wing Door. He stated, "This is the Capitol Building." Then, watching the first rioters enter the building through shattered windows, shouted, "This is my house!"



*Figure 6*

Connell watched as the rioters ahead of him banged on the glass to the Senate Wing Door with batons, and announced that he was going to kick the door in. But he was preempted when other rioters, now inside the building, opened the door to the crowd outside. Connell, identifiable by his distinctive hand tattoos, reached up and pulled the door fully open, thus allowing the mob to invade the Capitol. *See* Figure 7.



*Figure 7.*

At just before 2:14 p.m., Connell, with a cigarette balanced in his mouth, entered the Capitol. *See* Figure 8. He was the third rioter to pass through the now open Senate Wing Door and was among the first twenty rioters to enter the Capitol on January 6. As he crossed the threshold, an alarm was blaring due to his having opened the secured Senate Wing Door. *See* Gov. Ex. 8 at 00:10-00:13. After entering the building, he left the door open behind him so that others could follow him into the building. At least several hundred people did precisely that.



*Figure 8.*

Adams was one of the first rioters among the many hundreds of rioters who followed Connell through the Senate Wing Door. He entered the building approximately ten seconds after his cousin, holding his phone in his hand. *See* Figure 9. The door alarm continued to sound as Adams entered the building.



*Figure 9.*

Connell and Adams did not remain in the Capitol long. They entered at 2:13 p.m. and exited

through the Senate Wing Door between 2:16 p.m. and 2:17 p.m. As they would later announce to other rioters outside, they had done their part and cleared a way for others to breach the building.

Connell and Adams went back the way they came down the West Front and descended the Northwest Stairs a few minutes after exiting the Capitol. At the base of those stairs, they found that an immense crowd had gathered and was still growing. Facing the mob, Connell pointed up towards the Senate Wing Door and shouted, "That door is open!" Adams, coming a few steps behind Connell, added, "It's open let's go!" *See* Gov. Ex. 11 at 0:29-0:33. The crowd at the base of the steps immediately reacted to those statements. Some members of the crowd cheered, while others said, "Yeah!", "Ready?", "Can I go first?", "Let's go!", and "Do you want to go in? Let's go in." *Id.* at 00:33-01:31. Later that day, the pair boarded the Metro blue line, rode the train back to Springfield, and began the drive back to the Gulf Coast.

### 4. *Adams' and Connell's Facebook Messages*

As they were making the long journey home, Connell and Adams took to Facebook to boast about their exploits at the Capitol. In the hours and days following the riot at the Capitol, in both public posts and private messages on Facebook, Adams made the following statements:

**Adams:**    January 6, 2021: "Just to get things straight. It wasn't ANTIFA or BLM. It was pissed off American patriots."

January 6, 2021: "Me and my cousin led the charge. We were the first ones in[.] Don't show anyone this picture. […] We were the ones who broke through the last barricade."

January 6, 2021: "You would of (*sic*) been proud. Lol shit got old school real quick after they hit me with the tear gas"

January 6, 2021: When asked "did you put any [police officers] down," Adams responded, "I think four of them."

13

January 7, 2021: "I got beat up pretty good getting through the cops."

January 7, 2021: "Every time an elected official operates outside the boundaries of the constitution we need to burn this motherfucker down until they start arresting people."

January 7, 2021: "I don't wanna put a whole lot on Facebook but you and I need to get together and I will show you some crazy shit."

January 8, 2021: "Made it home. 2400 miles , 42 hours in three days. My voice was heard. I would rather die on my feet than live on my knees. Thanks for all the support. Good night y'all."

January 10, 2021: "I was one of the first ones in the Capitol Building. […] It was a fight at the beginning."

Connell, too, made a series of boastful statements in public posts and in private messages using his Facebook account:

**Connell:**    January 6, 2021: "We headed to the trump rally protest in dc for the rigged election."

January 7, 2021: When asked "what was the reason to breaking in the Capitol…?" Connell responded, "[W]e breached it to let America know we're not standing down anymore."

January 7, 2021: "Do y'all know what thousands of people look like vs couple hundred cops? If y'all wasn't there y'all don't know half of what went down today!"

January 7, 2021: "We were the first ones to breach the Capitol today. We got his (*sic*) with tear gas rubber bullets and batons. You damn right we got their attention. That was the whole point of what we did today. And today was just the start of something much bigger."

January 7, 2021: "Hell yeah [congressmen and women] were scared. They didn't expect a couple ole southern boys to get through all them damn police and knock the doors down!!! A revolution is coming."

January 7, 2021: "That's my cousin. When we stormed the cops there was 8 of them and 4 of us so he got clubbed and shot with rubber bullet. But we pushed the cops against the wall, they dropped all their gear and left. That's when we went to door of Capitol building and breach it."

January 7, 2021: "Barriers weren't just taken down. They didn't let us through. We got the shit beat outta of but eventually pushed through the cops. […] I was there! I was one of the first guys that breached the doors and got in. Antifa was not at the Capitol. BLM was not at the Capitol. They had cops with tear gas, flash bangs, rubber bullets, pepper spray! We got hit with all kinds of shit! But we kept pushing. We forces (*sic*) them to stand down. They had no other choice. They didn't just let us in the Capitol."

January 7, 2021: "I mean I actually enjoyed today 👮🤣🤣 we may have been shot at and hit with flash bangs and tear gas but it was well worth it lol."

January 7, 2021: "When we got to the Capitol there was thousands of people we had to push through to get there. Everyone on fb saying it was planned. It wasn't planned but man were (*sic*) tired of people talking and not doing anything. We need another 'peaceful' protest!"

As January 6 rolled into January 7, 2021, Connell's rhetoric became increasingly extreme, at one point going so far as to endorse the idea of engaging in a second civil war. Several conversations he had with various individuals over Facebook messenger show not only his pride in what he did on January 6 but also his intent to return to D.C. to engage in more violence:

> **Individual 1**: Looks like y'all had a blast
> **Connell**: We sore but we got in
> [*Connell sends a series of videos.*]
> **Individual 1**: Damn.
> [*Discussion about Parler being removed from various app stores.*]
> **Connell**: I'm afraid this is only the beginning.
> **Individual 1**: Oh there (*sic*) about to try and turn us into Nazi Germany bro.
> **Connell**: I read where China is talking about sending soldiers over here.

**Individual 1**: Yea sending 250,000 over here to assure a peaceful transition. That would be a bad bad mistake.
**Connell**: If they do I'm going back
**Individual 1**: I'm going with you and we're taking everything I got.
**Connell**: You damn right!
**Individual 1**: Bring the shit show. I'm ready.
**Connell**: I been ready
**Individual 1**: Me and you both
**Connell**: Should've never left tbh
**Individual 1**: Would be up there with no means of protection or gear
**Connell**: Yeah. That's really the only reason we left

\*\*\*

**Individual 2**: Y'all moving huh lmao
**Connell**: Slowly we slow and sore [as fuck] bro. We starting a revolution bro!
**Individual 2**: Y'all and 50000 others
**Connell**: I need to get home so I can get shit ready
**Individual 2**: It ain't gone happen that quick bro
**Connell**: You'd be surprised at the people ready to storm DC.
**Individual 2**: Idk man a lot of Americans are mad
**Connell**: Body 🙅 a lot of people only going to talk shit behind a phone or computer and never do shit. I'm done not doing shit and if it costs me my life then so be it. I won't die a ducking sheep bro. It'll be a few months before we go back. But when we do we'll be prepared and we'll have the numbers with us too.
**Individual 2**: Fasho. We'll see where everything plays out.

\*\*\*

**Individual 3**: Theres (*sic*) a damn hotline and photos of everybody in the Capitol
**Connell**: 🙅 they can find me when we go back […]
**Individual 3**: Fucking joke I swear.
**Connell**: Won't be a joke when we go back
**Individual 3**: Hell if we get treated like this, might as well be as bad as they say we are
**Connell**: We bout to be
Individual 3: Might well start a civil war
**Connell**: Plan on it

After returning to Louisiana, Connell made more specific plans with some of the individuals he messaged on Facebook. He intended to purchase long rifles, ammunition, and body armor with some of them and return to D.C. for the Inauguration on January 20. And he had no intention of returning to Louisiana unless it was in a body bag.

### C.    Connell's and Adams' Interviews with the FBI

#### 1.   *Connell*

Connell was arrested on January 16, 2021, waived his *Miranda* rights, and was interviewed by FBI agents. He stated he knew he had been arrested for going to Washington on January 6. Connell asserted that he and Adams did not go to D.C. with the intent to hurt anyone. He informed the agents that he went to D.C. after seeing Adams posted on Facebook that he was going, and that Adams picked him up in Louisiana. After attending the rally, they "followed the crowd marching towards the Capitol."

According to Connell, after the crowd reached the Capitol, the situation escalated. Connell stated that, although barriers were breached before they got to them, he and Adams saw tear gas cannisters being thrown by police. Connell stated that he and Adams then made their way to the Capitol doors and watched others break the windows and breach the doors. He also stated that Adams received a blow to the head, which resulted in a bleeding gash wound. Once they got inside the Capitol, Connell and Adams walked around until they found a kitchen, where they took some ice for Connell's head wound before leaving the Capitol. Connell denied breaking anything or bringing weapons into the Capitol.

Connell confirmed that he knew that there were many people online who "wanted to go back to the Capitol with guns" but stated that he and Adams had decided to not go back. Connell

was asked about Individual 1 and a relative of Individual 1 but stated that he had not seen them in five or six years. Connell described Individual 1's relative as "kind of an extremist." Connell stated that he was not aware of anyone who was planning to go back to the Capitol in any capacity or aware of anyone planning to do harm.

2.  *Adams*

Adams was also arrested on January 16, 2021. He too waived his *Miranda* rights and spoke to FBI agents. Adams stated that he and Connell drove to Washington to see the former president speak. Adams stated that, after driving from Louisiana to Virginia, they took a Metro train at the end of the Blue Line downtown D.C. He acknowledged taking photos and videos in Washington.

Adams said that he observed people on the stairs of the Capitol Building and heard what he thought might be flashbang grenades and tear gas being shot behind him. Adams said that he and Connell left the Capitol at the first opportunity they had and before anyone got inside the building. He denied assaulting police officers or permitting anyone to do the same. He further denied seeing anyone commit any assaults or damage government property. Adams was advised by the interviewing agents that lying to a federal agent is a crime.

When agents asked Adams if he had reached the walls of the Capitol, he stated he did not want to answer, "but I think you know what that means." When agents asked him if he would be seen on videos inside the building, Adams replied that the agents would "have to see." Adams admitted that he had been hit on the head, which caused a bleeding gash, but when asked if he got hit because he was near the police line, Adams replied "I guess we will have to see."

Adams admitted that he threw his phone in a lake in his neighborhood the day before he was arrested but said that he still had the clothes he wore that day in D.C. He also admitted to

deleting his Facebook page. Adams denied bringing any weapons or body armor with him to D.C. He further denied having any plans to return to D.C. or to acquire more guns or body armor.

Adams later proffered with the government on multiple occasions after his arrest, including in August 2021 and April 2022. In the process, Adams walked back his minimization.   Notably, he finally admitted that he assaulted the officers to the Capitol, and confessed he had done so, in part, because of what he viewed as a fraudulent presidential election.

## II.      THE CHARGES AND STIPULATED TRIAL

On January 16, 2021, Connell and Adams were arrested on a criminal complaint. On November 10, 2021, the grand jury returned a second superseding indictment against Connell and Adams, charging them with violations of 18 U.S.C. § 231(a)(3), 18 U.S.C. § 1512(c)(2) and 2, 18 U.S.C. § 111(a), 18 U.S.C. § 1752(a)(1) and (2), and 40 U.S.C. § 5104(e)(2)(D), (E), and (G). On July 27, 2023, both defendants waived their right to indictment by a grand jury and the government filed an information charging the same offenses with the exception of 40 U.S.C. § 5104(e)(2)(E). The parties proceeded by way of a stipulated trial. On July 28, 2023, this Court convicted Connell and Adams of all of charges on the information.

## III.     STATUTORY PENALTIES

The maximum penalties for each of Connell's count of conviction are set forth in his PSR at ¶¶ 122-128. The maximum penalties for each of Adams' counts of conviction are set forth in his PSR at ¶¶ 131-137.

## IV.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The appropriate offense level computations for Counts One through Five, before any grouping analysis under Part D of Chapter 3 or any credit for acceptance of responsibility are:

### Count One: 18 U.S.C. § 231(a)(3) – Civil Disorder

| Base Offense Level | 14 | U.S.S.G. § 2A.4, cross reference with adjusted based offense level under U.S.S.G. § 2A2.4(c)(1) |
|---|---|---|
| Specific Offense Characteristic – Official Victim | +6 | U.S.S.G. § 3A1.2(b): "If the victim was a government officer or employee" then "increase by six levels." |
| Total | 20 | |

### Count Two: 18 U.S.C. § 1512(c)(2) and § 2 - Obstruction of an Official Proceeding Before Congress, and Aiding and Abetting

| Base offense level: | 14 | U.S.S.G. §2J1.2 (a) |
|---|---|---|
| Special Offense Characteristic | +8 | U.S.S.G. §2J1.2 (b)(1)(B): "the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." |
| Special Offense Characteristic | +3 | U.S.S.G. §2J1.2 (b)(2): "the offense resulted in substantial interference with the administration of justice." |
| Total | 25 | |

**Count Three: 18 U.S.C. § 111(a)(1) – Assaulting, Obstructing, Interfering, or Impeding Certain Officers (USCP Officers J.G., T.M., B.S., B.M., and J.D.)**

| Base Offense Level | 14 | U.S.S.G. § 2A2.2 |
|---|---|---|
| Specific Offense Characteristic – Official Victim | +6 | U.S.S.G. § 3A1.2(b): "If the victim was a government officer or employee" then "increase by six levels." |
| Total | 20 | |

**Count Four: 18 U.S.C. § 1752(a)(1) - Entering and Remaining in a Restricted Building or Grounds**

| Base Offense Level | 4 | U.S.S.G. §2B2.3(a) |
|---|---|---|
| Specific Offense Characteristic | +2 | U.S.S.G. §2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted building or grounds." |
| Cross Reference | | U.S.S.G. §2B2.3(c)(1) ("If the offense was committed with the intent to commit a felony offense, apply § 2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to that felony offense, if the resulting offense level is greater than that determined above.")<br><br>The defendants committed the assaults charged in Count Three with the intent to commit the felony offense of obstruction of a proceeding before Congress, in violation of 18 U.S.C. § 1512(c)(2), charged in Count Two. |
| Base Offense Level (adjusted) | 25 (from Count Two) | U.S.S.G. § 2X1.1(a): "the base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." |
| Total | 25 | |

**Count Five: 18 U.S.C. § 1752(a)(2) - Disorderly and Disruptive Conduct in a Restricted Building or Grounds**

| Base Offense Level: | 10 | U.S.S.G. §2A2.4(a) |
|---|---|---|
| Specific Offense Characteristic | +3 | U.S.S.G. § 2A2.4(b)(1) "If (A) the offense involved physical contact … increase by 3 levels."<br>The defendants made physical contact with USCP Officers J.G., T.M., B.S., B.M., and J.D when they pushed and shoved them on the Northwest Stairs. |
| Cross reference | | U.S.S.G. § 2A2.4(c): "If the conduct constituted aggravated assault, apply U.S.S.G. § 2A2.2(a) (Aggravated Assault)." The Application Notes to Section |

| | | |
|---|---|---|
| | | 2A2.2 define "aggravated assault" as a "felonious assault that involved … (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; … or (D) an intent to commit another felony." U.S.S.G. §2A2.2 cmt n. 1.<br><br>The conduct of Connell and Adam constituted aggravated assault because it was a felonious assault that involved the intent to commit another felony. The Guidelines do not define "assault" or "felonious assault." Sentencing courts have looked to the common law to define "assault" for Guidelines purposes. *See United States v. Hampton*, 628 F.3d 654, 660 (4th Cir. 2010). Assault encompasses conduct intended to injure another or presenting a realistic threat of violence to another. *See United States v. Dat Quoc Do*, 994 F.3d 1096, 1099 (9th Cir. 2021) (federal common-law assault includes (1) "a willful attempt to inflict injury upon the person of another," or (2) "a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm.") (citations omitted); *Lucas v. United States*, 443 F. Supp. 539, 543-44 (D.D.C. 1977) (defendant assaulted a police officer, in violation of 18 U.S.C. § 111, where he "forcibly grabbed" the officer; § 111 "includes the lifting of a menacing hand toward the officer, or shoving him"), aff'd, 590 F.2d 356 (D.C. Cir. 1979).<br><br>Here, Adam and Connell pushed and shoved a line of police officers. That conduct constituted aggravated assault because it was committed with the intent to commit another felony, namely, Obstruction of an Official Proceeding before Congress charged in Count Two and involved physical contact. Therefore the cross reference to U.S.S.G. §2A2.2 applies. |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) Aggravated Assault |
| Specific Offense Characteristic – Official Victim | +6 | U.S.S.G. § 3A1.2(b): "If the victim was a government officer or employee" then "increase by six levels." |
| Total | 20 | |

The sentencing guidelines do not apply to Counts Six and Seven because those offenses are Class-B misdemeanors.

Here, Counts 2, 4 and 5 group because they involve the same victim: Congress. U.S.S.G. § 3D1.2. Counts 1 and 3 also group because they involve the same victims, USCP Officers J.G., T.M., B.S., B.M., and J.D. Finally, 1 and 3 group with Count 2 under U.S.S.G. § 3D1.2(c) because Counts 1 and 3 embody conduct that establishes a specific offense characteristic for Count 2, the eight-level enhancement under U.S.S.G. § 2J1.2(b)(1)(B). Consequently, all five counts constitute a single group.

The offense level for the group is the offense level for the count with the highest offense level, which is Count 2. Therefore, the combined offense level for these offenses is 25 prior to any adjustment for acceptance of responsibility.

### 1. *Connell's Guidelines Calculation*

The U.S. Probation Office calculated Connell's criminal history as Category II, which is not disputed. Connell PSR ¶78. In light of Connell's agreement to proceed with a stipulated trial in which he agreed to all of his conduct underlying each element of every charge he faced, Connell qualifies for a two-point reduction of his offense score for acceptance of responsibility under Section 3E1.1(a). Likewise, the government submits that a third-point reduction is appropriate under Section 3E1.1(b). As a result, Connell's final offense level is 22 with a corresponding Guidelines range of 46-57 months' imprisonment.

### 2. *Adams's Guidelines Calculation*

The U.S. Probation Office calculated Adams' criminal history as Category I, which is not disputed. Adams PSR ¶ 76.

For Adams, the government, pursuant to U.S.S.G. § 3C1.1, seeks a two-level increase in his offense level based on his obstruction of the investigation of this case. Adams was arrested nine days after January 6. During that time, there was substantial national news coverage about the events of January 6 and arrests that were being made in connection with those events. Knowing that, Adams chose to destroy evidence by taking his phone—which he had used to plan his trip to D.C., call for travelling companions, document his crimes, and boast about his conduct—and throwing it into a lake near his house. By chance, Adams, according to his custodial interview, discarded the phone the day before he was arrested. The phone was never recovered. Adams also attempted to impede the investigation by deleting his Facebook account, the forum that he had used to publicly broadcast his many offenses.[2] Adams admitted to the FBI during his *Mirandized* custodial interview that he destroyed the phone and deleted his Facebook account.

Moreover, Adams repeatedly lied to the agents interviewing him during his custodial interview by claiming that he and Connell turned away from the Capitol as soon as they saw violence and never entered the building. These statements from Adams, who led the charge up the stairs, assaulted officers at the head of the mob, and entered the building within seconds of the first breach, were false. By destroying his phone, attempting to delete his Facebook account, and lying to the FBI, Adams was "willfully obstruct[ing] or imped[ing], or attempt[ing] to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction," and "the obstructive conduct related to [Adams'] offense[s]

---

[2] By the time that Adams deleted his Facebook account, the government had already preserved it and was in the process of executing a search warrant for the contents of it. Therefore, despite Adams' efforts and unlike with the phone, the government was able to gain access to his Facebook account and review its contents.

of conviction and any relevant conduct." U.S.S.G. § 3C1.1. Therefore, a two-level increase is warranted under U.S.S.G. § 3C1.1. Applying this increase to Adams' Guidelines yields a score of 27 before any reduction for acceptance of responsibility.

Section 3E1.1(a) provides a two-level decrease in offense level "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." Similarly, Section 3E1.1(b) provides for an additional one-level reduction in offense level in certain circumstances applicable here. In determining whether to apply the adjustment, a court should consider, among other things, whether the defendant "truthfully admitt[ed] the conduct comprising the offense(s) of conviction, and truthfully admit[ed] or [did] not falsely deny[ ] any additional relevant conduct for which the defendant is accountable under § 1B1.3"—which includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" and all harm caused by those acts or omissions or was the object of those acts or omissions. U.S.S.G. §§ 1B1.3(a)(1)(A), 3E1.1 cmt. n.1(A). Pleading guilty before trial, or, as here, admitting by way of stipulated trial all the conduct comprising the offenses, and not falsely denying any additional relevant conduct "constitute[s] significant evidence of acceptance of responsibility for the purposes of subsection (a)." U.S.S.G. § 3E1.1 cmt. n.3.

Notably, conduct resulting in an obstruction of justice adjustment can co-exist with acceptance of responsibility "in extraordinary cases." U.S.S.G. § 3E1.1 cmt n.4. Here, the government's position is that this is an extraordinary case where both obstruction and acceptance of responsibility adjustments should apply. That's because the timeline supports such a finding. "In evaluating whether [a defendant's] case was an 'extraordinary' one, [the court] must look at the relationship between his obstructive conduct and his acceptance of responsibility." *United*

*States v. Gregory*, 315 F.3d 637, 640 (6th Cir. 2003). Where the obstructive conduct pre-dated the acceptance of responsibility, the acceptance adjustment may apply. *See id.* ("All of his obstructive conduct predated the indictment and the guilty plea. He has fully cooperated subsequently."); *United States v. Hopper*, 27 F.3d 378, 383 (9th Cir. 1994) ("Cases in which obstruction is not inconsistent with an acceptance of responsibility arise when a defendant, although initially attempting to conceal the crime, eventually accepts responsibility for the crime and abandons all attempts to obstruct justice."). Here, the obstructive conduct all predates Adams's agreement to a stipulated trial, which was finalized in July 2023. More significantly, Adams admitted to the conduct that provides the basis for the obstruction of justice enhancement when debriefing with the government. Finally, he has largely cooperated with the government's investigation after his initial omissions and minimization.

Ultimately, then, Adams faces an offense score of 24 with a Guidelines range of 51-63 months' imprisonment.

3. *Government's Recommendation for Both Defendants*

A sentence of 51 months is within both Guidelines ranges and is warranted for both defendants. Their conduct, while different in certain respects, reflects a pair of defendants equal in culpability and conduct. Adams initiated the duo's travel plans and attendance in D.C. on January 6, and he ultimately was the vocal leader on the steps when he harnessed Connell and the mob and led the charge forward against the officers. Connell joined Adams every step of the way and then took it further—later evolving into an ongoing threat to D.C. and the Republic by planning to return for violence on Inauguration Day. While 51 months is a low-end sentence in Adams's Guidelines range, that result is explained, in part, by the fact that he ultimately proffered with the

government multiple times, accepted responsibility, and agreed to a stipulated trial. Similarly, 51 months is a mid-point in Connell's Guidelines range, which is appropriate in part due to his prior criminal history and lack of proffers with the government regarding his conduct.

Respectfully, the Court should sentence both Adams and Connell to 51 months, three years of supervised release, restitution of $2,000 and a mandatory assessment of $360.

## V.      SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of an imprisonment term of 51 months.

### A.      Nature and Circumstances of the Offense

Connell's and Adams' respective conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. The attack on the Capitol was a norm shattering event that, by its very nature, defies comparison to other events in American history much less isolated instances of criminal behavior by individuals.

While each defendant should be sentenced based on his or her individual conduct, each

individual person who entered the Capitol or assaulted police on January 6 did so under the most extreme circumstances and their conduct directly contributed to those circumstances.   As a person entered the restricted area around the Capitol, they would—at a minimum—have passed numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed extensive fighting with police. In this case, there is no question that Connell and Adams saw officers being assault and overrun, barricades being trampled, and windows being smashed, because in many instances they were actively participating in these acts or documenting them, if not both.

The nature and circumstances of Connell's and Adam's particular crimes weigh in favor of a 51-month term of imprisonment. Together, they drove more than one-thousand miles to arrive in D.C. on the morning of January 6. After attending the "Stop the Steal" rally, they went to the Capitol where they quickly made their way to the head of the crowd and led the charge up the Northwest Stairs into the Northwest Courtyard.

The importance of Connell and Adams' leading the charge up the Northwest Stairs cannot be overstated. Connell and Adams were at the head of a column of thousands of rioters who were being held back on the landing of the Northwest Stairs by a group of seven officers. By rallying this crowd to assault the officers and finish the drive up the steps, Connell and Adams opened the Upper West Terrace, and eventually the Capitol building itself, to the riot. The 2:13 p.m. breach of the Senate Wing Doors, which was a direct consequence of Adams and Connell's charge and assault against USCP Officers J.G., T.M., B.S., B.M., and J.D. and in which Connell and Adams participated, is what caused the Congressional proceeding to certify the Electoral College vote to

be suspended for approximately six hours.

This breach also had significant strategic implications for the police officers who were attempting to hold the line in the West Plaza during the riot. With the Upper West Terrace now fully open, the rioters were able to gain a strategic elevated position over the police in the West Plaza. After gaining access to the Upper West Terrace and due to the construction for the inauguration that was taking place on the West Front, the rioters were able to use the scaffolding, risers, and grandstands to gain a three-hundred- and sixty-degree, elevated position over the police officers in the West Plaza. At that point, the rioters not only had a numerical but also strategic and positional advantages as well. The officers in the West Plaza now had to contend with a crowd of thousands directly in front of them and a crowd above them, behind them, and flanking them that was increasing in size by the minute. Now being accosted from above and all sides, the police line in the West Plaza, which had held for nearly an hour, fell exactly twenty minutes after Connell and Adams led the charge up the Northwest Stairs. The surrounded officers in the West Plaza were forced to retreat into the Lower West Terrace tunnel, where a sustained fight between a small group of police officers and hundreds – possibly, thousands – of rioters raged for nearly two hours. All of this can be traced back to the moment that Adams yelled "Let's go!" on the Northwest Stairs at 2:08 p.m. and charged against the officers on the landing with Connell following close behind. The nature and circumstance of Connell's and Adams' offenses weigh heavily in favor of 51-months of incarceration.

### B.  Connell and Adams' History and Characteristics

Adams, who was forty-three years old on January 6, 2021, had one prior conviction from Texas in 2006. Adams PSR ¶ 76. Other than that conviction, until his participation in the January

6 riot, he had lived a productive life as a contributing member of society. However, Adams'
wrongdoing did not end on January 6, 2021. During his initial FBI interview, Adams repeatedly
lied and minimized to the interviewing agents. When confronted with the evidence against him or
asked about specific video footage that showed him committing illegal acts at the Capitol, Adams
repeatedly made statements to the effects of "I guess you'll have to see" and, after refusing to
answer to answer a question, "I think you know what that means." Adams also told the agents that
he destroyed his phone and attempted to delete his Facebook page before the FBI could access it.

To be sure, Adams proffered multiple times with the government and eventually walked
back his minimization, admitting that he assaulted multiple officers in an effort to get to the
Capitol. And he, like Connell, agreed to a stipulated trial confronted with an overwhelming amount
of evidence of their actions, statements, and intent. But his initial efforts to obfuscate and mislead,
his efforts to destroy evidence of his crimes, and the leadership role he took on January 6 with the
pride he exhibited afterward all support a 51-month sentence.

Connell, who was twenty-seven years old on January 6, 2021, has been arrested at least
three times and has two criminal convictions. On October 17, 2016, Connell pled guilty to a charge
of simple battery, in violation of La. Stat. Ann. § 14:35, and was sentenced to six months of
incarceration in the Caddo Parish Jail. That prison sentence was suspended pending Connell's
successful completion of six months of supervised probation. On December 14, 2022, Connell
pled guilty to simple criminal damage to property and was sentenced to a deferred sentence of
three months of incarceration and six months of probation. Connell PSR ¶ 77.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law.

As with the nature and circumstances of the offense, this factor supports a lengthy sentence

of incarceration. Adams' and Connell's conduct on January 6 was the epitome of disrespect for the law and our constitutional process. Moreover, they engaged in serious violent conduct in connection with that disrespect for the law and the constitutional process.

Connell and Adams' assaults against five USCP officers on the Northwest Stairs showed not only a disregard and disrespect for law enforcement officials, but a willingness to engage in violent, illegal conduct to further their political ends. The evidence amply establishes that they committed these crimes in furtherance of their underlying motive to stop the transition of power between presidents. Because of their readiness to do violence at the head of the mob, they were temporarily successful as the Congress was forced to recess at the moment that they entered the building. Connell and Adams were not merely disrespecting the law, they were active and eager participants in an attack on the bedrock principle of our republic. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that, as our nation approaches yet another national election year, this violent conduct and the motives that underlie it are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

**D.      The Need for the Sentence to Afford Adequate Deterrence**

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general

---

[3] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to these particular defendants weighs in favor of a term of a 51-month term of incarceration. As they began to make their journey home from D.C., Adams and Connell reveled in their crimes. They bragged to friends and family about their conduct, describing in detail the assaults that they committed against police officers. Adams, making specific reference to the electoral process going on in the building, referred about the need to "burn this motherfucker down" because his candidate of choice had lost. Connell went a step further and, within hours after the January 6, 2021, attack on the Capitol, began discussing a return trip to the D.C., the need to come armed, and his readiness to engage in civil war.

During his interview with the FBI, Connell minimized some of his conduct and was not truthful given what he *knew* he had done as he articulated to others on Facebook. However, Connell's conduct during his FBI interview pales in comparison to what he discussed with others following January 6. Connell talked at length about stockpiling long rifles and body armor and returning to D.C. to violently stop President-elect Biden's Inauguration, both ready to and expecting to die in the process. If he actually intended to undertake that carnage, he was unable to do so because he was arrested on January 16.

With their actions at the Capitol and their words after the fact, both Connell and Adams have shown themselves to be in need of specific deterrence to prevent them from ever committing these types of acts again. A prison term of 51 months is well suited to serve that purpose of specific deterrence for both of them.

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the

Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[4]

---

[4] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[5]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases[6] provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Greg Rubenacker*, 21-cr-193 (BAH), the defendant, like Connell and Adams, was one of the first rioters to enter the building. Also like Connell and Adams, when Rubenacker was confronted by police officers who blocked his way, he chose to escalate the violence and assault the officers rather than walk away. Like Connell and Adams, Rubenacker took to social media to memorialize and brag about his crimes. Rubenacker, like Adams, also tried

---

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

[6] In addition to the two cases described in detail, the government directs the court to the cases of *United States v. Nolan Cooke*, 22-CR-52 (RCL), and *United States v. Moises Romero*, 21-CR-677 (TSC). In both of these cases, the defendants pled to the sole count of violating 18 U.S.C. § 231(a)(3) and, within a Guidelines range of 8 to 14 months, received above midpoint sentences of 366 days.

to cover up his crimes by making efforts to obscure the digital evidence of his crimes.[7] And like Connell and Adams, Rubenacker was convicted of 18 U.S.C. § § 1512(c)(2), 18 U.S.C. § 231(a)(3), 18 U.S.C. § 111(a), and multiple counts of 18 U.S.C. § 1752 and 40 U.S.C. § 5104(e)(2). Unlike Connell and Adams, however, Rubenacker did not clear a path for other rioters to use to breach the Capitol, announce that path to rioters passing by, force an officer to strike him with a baton, or discuss returning with weaponry and being prepared to die.  Chief Judge Howell sentenced Rubenacker to 41 months of incarceration, the bottom of the Guidelines range she found applicable.

In *United States v. Scott Fairlamb*, 21-cr-120 (RCL), the defendant, like Connell and Adams, breached the Capitol through the Senate Wing Door within one minute of the first breach. Also like Connell and Adams, Fairlamb entered the scaffolding structure about the Northwest Stairs had been overrun, however Fairlamb also climbed up the scaffolding structure. During the riot, Fairlamb assaulted an officer, as did Connell and Adams.[8]. Like Adams, Fairlamb destroyed evidence of his crimes. Like both Connell and Adams, Fairlamb also took pride in his crimes. Fairlamb was convicted of 18 U.S.C.  § 1512(c)(2) and 18 U.S.C. § 111(a)(1). Significantly, however, unlike Fairlamb, Connell and Adams both acted as leaders of the mob rather than simple participants. Judge Lamberth sentenced Fairlamb to 41 months of incarceration, the bottom of the Guidelines range he applied.

Both *Rubenacker* and *Fairlamb* bear key similarities to Connell and Adam. First, both Rubenacker and Fairlamb engaged in violent conduct against police officers in furtherance of their

---

[7] Unlike Connell and Adams, Rubenacker reentered the building after being forced from it once, was in the building for a long period of time, and he tried to gain entry to the Senate Chamber.

[8] Whereas Connell and Adams pushed the officers, Fairlamb punched them.

goal of trying to stop the certification of the Electoral College vote and, in connection with that, were some of the first rioters to enter the building. Second, both defendants acknowledged their guilt and were convicted of violating 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 111(a)(1), although Rubenacker was also convicted of violating 18 U.S.C. § 231(a)(3).

However, an important distinction between *Rubenacker* and *Fairlamb* and this case is that, although both were near the head of the mob during the first breach and Rubenacker did confront of officers when they stood in his way, neither of them acted as leaders of the mob at so crucial a point as did Adams and Connell did.   This essential distinction militates in favor of a 51-month because it reflects the severity of Connell and Adams' conduct juxtaposed against similar cases and still accounts for their acceptance of responsibility given that the Guidelines are after reducing their offense score by three points.

## VI.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases

involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted).

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

Because the defendants in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and their criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendants responsible for their individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that

comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").]

More specifically, the Court should require Connell and Adams to each pay $2,000 in restitution for his convictions.  That amount fairly reflects their role in the offense and the damages resulting from their conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, $2,000 has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VII.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 51 months of incarceration, three years of supervised release, restitution of $2,000, and a mandatory assessment of $360 on both Cody Page Carter Connell and Daniel Page Adams.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:     *s/ Sean P. McCauley*
SEAN P. McCAULEY
New York Bar No. 5600523
Troy A. Edwards, Jr.
Assistant United States Attorneys
United States Attorney's Office
For the District of Columbia
601 D Street, NW
Washington, DC 20530
Sean.McCauley@usdoj.gov