## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CODY PAGE CARTER CONNELL, and<br>DANIEL PAGE ADAMS,<br><br>       Defendants. | Crim. Action No. 21-0084 PLF |

### DEFENDANT CODY CONNELL'S
### MEMORANDUM IN AID OF SENTENCING

Cody Connell came to Washington, D.C. on January 6, 2021 at the invitation of President Trump, who told his followers that the election results were incorrect, that this created a national security threat, and that his supporters should go to the Capitol to "fight like hell" on his behalf. The alarmist and inciteful rhetoric used by President Trump and those around him had the desired effect. Mr. Connell, along with hundreds of thousands of other Americans, was convinced that the election was being stolen from President Trump and he wanted to answer the President's call for action. Mr. Connell went to the Capitol building with thousands of people who had been worked into a frenzy. He pushed past a group of officers on a stairway on the West front of the Capitol, entered through an open door, then left the building within a few minutes after entering. He now recognizes that his conduct on that day was wrong, he is no longer interested in re-litigating the election results, and he is prepared to accept punishment for his actions. But it is also important to remember that Mr. Connell did not cause any damage, he did not take anything, and he did not

cause any injury to members of law enforcement. The punishment for Mr. Connell's conduct should be reasonable and not overly harsh.

Mr. Connell, now 30 years old, has overcome significant obstacles in life to become a loving single parent to his 11-year old daughter. ███████████████

 To his credit, Mr. Connell has not let these challenges overwhelm him. He has worked consistently, largely in oil fields in Louisiana, and he is the proud father of an 11-year-old daughter, ████ . █████████████████ ███████████████████ Mr. Connell has full custody of her and her well-being is his sole focus. His main concern is that a lengthy prison sentence would take him away from his daughter and put her at risk.

Mr. Connell accepted responsibility for his conduct by waiving the right to trial and agreeing to a stipulated facts bench trial which took the same amount of time as a traditional guilty plea. The stipulated facts trial was necessary only because the government was unwilling to offer a conditional guilty plea that would have allowed Mr. Connell to preserve the right to challenge guideline enhancements and the applicability of the obstruction charge to his conduct in this case, an issue that was the subject of a recent decision by the D.C. Circuit and that continues to be litigated. The defense here asks the Court to impose a sentence that reflects the nature of Mr. Connell's conduct, but also takes into account the fact that Mr. Connell works and is the sole caregiver for his young daughter. A long custodial sentence would have a devastating impact on Mr. Connell and his family.

## I.   PROCEDURAL HISTORY

On February 5, 2021, Mr. Connell and Mr. Adams were charged with eight counts related to their presence at the Capitol on January 6, 2021.  Mr. Connell and Mr. Adams proceeded via a stipulated bench trial on July 28, 2023 in order to preserve their right to appeal the application of 18 U.S.C. § 1512 to their conduct.[1] Following

---

[1] As the Court is well aware, the Honorable Judge Nichols held that conduct like Mr. Connell's on January 6 cannot qualify as conduct that "otherwise obstructs, influences, or impedes" an official proceeding, within the meaning of Section 1512(c)(2) because it did not involve the destruction of evidence or documents. The government appealed Judge Nichols's opinion in *United States v. Miller*, 589 F. Supp. 3d 60 (D.D.C. 2022) and a split decision of the D.C. Circuit in *United States v. Fischer*, 64 F.4th 329 (D.C. Cir. 2023), reversed Judge Nichols's opinion. Defendants in Fischer and Miller have petitioned the Supreme Court for a *writ of certiorari*.

his conviction, Mr. Connell cooperated with Probation in the Pre-Sentence interview process.

## II.    OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT

Pursuant to 18 U.S.C. § 3553(a), Rule 32 of the Federal Rules of Criminal Procedure, and Section 6A1.3 of the advisory United States Sentencing Guidelines ("USSG"), Mr. Connell states that he has reviewed the Pre-Sentence Investigation Report (PSR) and offers the following objections to the PSR.

### A.    The PSR incorrectly applied the U.S.S.G. § 2J1.2(b)(1)(B) specific offense characteristic

§2J1.2(b)(1)(B) applies "[i]f the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." If found to be applicable, this enhancement adds 8 additional offense levels, dramatically increasing the sentencing range. The defense objects to application of the §2J1.2(b)(1)(B) enhancement in this case for two separate reasons.

First, Mr. Connell did not cause or threaten to cause physical injury to a person or property damage. Mr. Connell acknowledges that he pushed past officers to go up the stairs towards the Capitol. But this brief moment did not involve either causing injury to any officer or threatening to cause physical injury to an officer or property damage. There is no evidence that Mr. Connell's actions caused physical injury to any person.  Nor is there any evidence that Mr. Connell threatened physical injury to any officer. This was an incident on a long day that lasted only a matter of seconds. Joining a crowd that pushed past officers who were standing between Mr. Connell

and the Capitol was illegal, but it did not involve a threat to physically injure those officers. *Compare United States v. Wright*, No. 21-341-CKK, 2023 WL 2387816, *8 (D.D.C. March 4, 2023) (finding threat to cause physical injury where defendant, pre-January 6, wrote posts about "fighting the blue," "we are going to drag them out," and "almost war time," then on January 6 picked up a metal barricade and pushed into officers with it). Particularly given that this specific offense characteristic calls for an additional 8 offense levels and would increase Mr. Connell's guideline range by *three years*, an actual injury or threat of real physical injury or property damage must be shown to warrant application of this enhancement. There is no such evidence here.

Second, Mr. Connell's conduct was not aimed at "obstruct[ing] the administration of justice." Here, the reasoning of Judge McFadden in *United States v. Seefried*, 638 F.Supp.3d 8 (D.D.C. 2022) should be adopted.[2] As Judge McFadden held, the "administration of justice" refers to a judicial or related proceeding that determines rights or obligation.[3] The electoral certification was not such a proceeding.

_____

[2] Counsel has attached Judge McFadden's Order as Exhibit 3 and incorporates it by reference.

[3] The defense acknowledges the D.C. Circuit's recent decision in *United States v. Robertson*, -- F.4th --, 2023 WL 6932346 (D.C. Cir. Oct. 20, 2023). However, in that case the D.C. Circuit considered the question of whether Congress' certification of the election was an "administration of justice" on plain error review and did not thoroughly examine the issue or address Judge McFadden's comprehensive decision in *Seefried*. This is because the defendant had not raised the issue at sentencing. *Id*. at *18. Indeed, very little attention was devoted to this issue in the opinion. *Robertson* does not bind this Court on the question of whether the electoral certification involved the "administration of justice."

The guidelines application note states that "substantial interference with the administration of justice" includes:

> a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources.

U.S.S.G. §2J1.2 cmt. n. 1. All of these examples relate to judicial proceedings and have no meaningful relationship to a ceremonial certification of election results in Congress.

Many courts in this District, including this one, have held that the certification of electoral votes occurring on January 6 were an "official proceeding," such that obstruction of that certification amounted to a violation of 18 U.S.C. § 1512(c)(2). Application of the § 2J1.2 enhancement would require this Court to find that the certification *also* involved the "administration of justice." In *Seefried*, Judge McFadden relied upon legal definitions of "administration of justice" to conclude that "administration of justice" involved a "judicial or quasi-judicial tribunal that applies the force of the state to determine legal rights." *Seefried* at *4. He further found that the certification of electoral votes does not share these characteristics, as it is largely a ceremonial proceeding that takes place in the deliberative branch of government rather than branches that typically exercise judgement or force. Definitions of "interfering with the administration of justice" all establish that the "administration of justice" involves a legal proceeding like a trial or grand jury hearing.

Taken further, courts do not interpret the guidelines in a manner different from their interpretation of statutory text. *E.g.*, *United States v. Martinez*, 870 F.3d

870 F.3d 1163, 1166 (9th Cir. 2017) ("We interpret the Sentencing Guidelines using the ordinary tools of statutory interpretation."). Thus, the proper inquiry into meaning "will most often begin and end with the text and structure of the Guidelines." *Id.* "The language of the Sentencing Guidelines, like the language of a statute, must be given its plain and ordinary meaning." *United States v. Fulford*, 662 F.3d 1174, 1177 (11th Cir. 2011). Therefore, courts' construction of the phrase "administration of justice" as it appears in Title 18 should not differ from their interpretation of the same phrase in the guidelines. *Id.*

Here, there is no real debate. Every circuit that has addressed the question has held that the phrase "administration of justice" refers to judicial proceedings. *United States v. Richardson*, 676 F.3d 491, 502-503 (5th Cir. 2012) ("[O]bstructing the due administration of justice means interfering with the procedure of a judicial hearing or trial."); *United States v. Brenson*, 104 F.3d 1267, 1279-80 (11th Cir. 1997) ("due administration of justice" means "judicial procedure" and "the performance of acts required by law in the discharge of duties such as appearing as a witness and giving thoughtful testimony when subpoenaed"); *United States v. Warlick*, 742 F.2d 113, 116 (4th Cir. 1984) (defining obstruction of the "administration of justice" as acts that "thwart the judicial process"); *United States v. Rasheed*, 663 F.2d 843, 851 (9th Cir. 1981) ("administration of justice" commences with "a specific judicial proceeding"). The aforementioned application note to U.S.S.G. §2J1.2(b) bolsters that commonsense reading. Every example of substantial interference with the

"administration of justice" involves interference with an investigation or evidence. U.S.S.G. §2J1 cmt. n. 1.

Text aside, law-of-the-case and estoppel principles foreclose application of these specific offense characteristics. As the Court knows, January 6 defendants including Mr. Connell have filed dozens of motions to dismiss the § 1512(c)(2) charge in front of every judge of this Court. One of their arguments was that Congress's joint session to count electoral votes does not constitute an "official proceeding" under that statute because, among other reasons, it did not involve the administration of justice. *See* Defense Motion to Dismiss, ECF No. 77 at 9-10. In response, the government has contended that the joint session did not need to entail the administration of justice to constitute an "official proceeding." And in dozens of filings the government all but conceded, that, in fact, the joint session did not administer justice. *See United States v. William Pepe*, 21-cr-52, ECF No. 55 (D.D.C. 2021), p. 8 n. 3 (government: "the certification of the Electoral College vote is not an 'inquiry or investigation'"); *United States v. Knowlton*, 21-cr-46, ECF No. 63 (D.D.C. 2021), p. 12 (government: "The 'proceeding before Congress' is not limited to proceedings solely related to the administration of justice."); *United States v. Nordean*, 21-cr-175, ECF No. 106 (D.D.C. 2021), p. 21 (government acknowledging that although § 1512(c)(2) had "never been applied" outside the context of the administration of justice, the "unprecedently brazen attack" on the Capitol justified application outside that context).

The government's arguments on this score led the Court to positively hold that the joint session *does not administer justice. United States v. Montgomery*, 578 F.

Supp. 3d 54 (D.D.C. 2021) ("Congress does not engage in . . . 'the administration of justice.'"); *see also United States v. Sandlin*, 575 F. Supp. 3d 16, 24 (D.D.C. 2021) ("[T]he Court will not read an 'administration of justice' requirement into 'official proceeding.'").

In fact, this Court addressed this very issue in *United States v. Puma*, 596 F.Supp.3d 90, 100 (D.D.C. 2022), acknowledging that Congress does not engage in the "administration of justice":

> Moreover, a "proceeding before the Congress" cannot be construed as limited to a quasi-judicial proceeding involving the administration of justice because "[a]s a matter of separation of powers, that is not what Congress does." United States v. Montgomery, 578 F.Supp.3d at 65; see also United States v. McHugh, 583 F.Supp.3d at 16 ("Requiring a § 1515 'proceeding' to be adjudicative would make 'a proceeding before the Congress' something close to a null set.").

This Court went on to note that the definition of "official proceeding" incorporated into Section 1512(c) was broad and *distinct from* a pre-existing statute, Section 1503, which prohibits obstruction of "the due administration of justice." *Id*. at 101. This Court concluded that a violation of 1512(c)(2) did not involve obstruction of "the administration of justice" because Section 1512(c)(2) did not include any reference to the "administration of justice" or reference the language "just a few statutory sections away." *Id*. (*citing United States v. Grider*, 585 F.Supp.3d 21, 29 (D.D.C. Feb. 9, 2022)). Further, in its decision denying defendants' motion to dismiss in this case, this Court wrote:

> Likewise, contrary to Mr. Connell's and Mr. Adams' assertion, there is no requirement that an "official proceeding" must be a "tribunal-like proceeding[ ] relating to adjudication, deliberation, and the *administration of justice*." Mot. at 9-10.

*United States v. Connell*, No. CR 21-0084 (PLF), 2023 WL 4314903, at *4 (D.D.C. July 3, 2023) (*emphasis added*). If the Court was of the opinion that the Electoral Vote Certification involved the administration of justice, none of the above analysis would have been necessary.

Having denied defendant's dismissal motion that argued the joint session needed to, but did not, administer justice, the Court cannot find, under the same tools of interpretation, that "administration of justice" now means something different under the Guidelines. It would be improper to rule, on the one hand, that the Electoral College Certification did not involve the administration of justice and that there is no such requirement in Section 1512(c)(2), and then impose two extremely harsh sentencing enhancement based on the opposite conclusion – namely that the Electoral Vote certification *did*, in fact, involve the administration of justice.  Under the law-of-the-case doctrine, "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case." *United States v. Carr*, 557 F.3d 93, 101 (2d Cir. 2009). The doctrine is "driven by considerations of fairness to the parties, judicial economy, and the societal interest in finality." *Id.*

Indeed, it would be contrary to due process as well as nonsensical to assume that the Sentencing Commission meant to include "official proceeding" though it did not include the phrase in Section 2J1.1. As indicated, the Guidelines are interpreted using the same tools of construction that are employed in the interpretation of statutory text. *Martinez*, 870 F.3d at 1166; *Fulford*, 662 F.3d at 1177. The government

and the defense alike cannot read words into the guidelines that the Commission did not include.

## B.   The PSR incorrectly applied the U.S.S.G. § 2J1.2 specific offense characteristic

Mr. Connell also objects to the application of the three-level enhancement for interference with the administration of justice under U.S.S.G. § 2J1.2(b)(2). The relevant specific offense characteristic provides as follows:

> If the offense resulted in substantial interference *with the administration of justice*, increase by 3 levels.

U.S.S.G. §2J1.2(b)(2) (emphasis added). For the reasons set forth above and in the Honorable Judge McFadden's opinion on this issue in *Seefried*, the enhancement does not apply because Congress' certification of the election results did not involve the "administration of justice."

Neither specific offense characteristic applies here. The total offense level should be 14, reduced to 12 to reflect Mr. Connell's acceptance of responsibility.

## C.   Request for downward departure

Mr. Connell asks the Court to grant a downward departure under U.S.S.G. § 4A1.3(b)(1) because his criminal history category "substantially over-represents the seriousness of [Mr. Connell's] criminal history or the likelihood that [Mr. Connell] will commit other crimes."[4] Mr. Connell has two criminal history points, each stemming from very minor incidents, each of which arose under unique

---

[4] Alternatively, Mr. Connell asks the Court to consider these arguments and grant him a variance.

circumstances. The first conviction, from 7 years ago when Mr. Connell was 23 years old, was for a misdemeanor battery in which ██████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████████

Mr. Connell's only other conviction is another misdemeanor, for simple criminal damage to property, which occurred ██████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████████████.

█████████████████████████████████████████████

██████████████████████████████

As the above explanations illustrate, neither of these convictions reflects a real propensity to engage in criminal activity. Mr. Connell should be treated as if he fits in criminal history category I.

**D.    Overall defense guideline calculation**

The following Guidelines calculation takes into account all of the above arguments regarding the objections to the Guidelines and a request for a downward departure.

- o **Offense Level Calculation**
  - ▪ 2J1.2 Base Offense Level                14
  - ▪ Specific Offense Characteristics: § 2J1.2(b)(2) is not applicable
  - ▪ Acceptance of Responsibility
    - • 3E1.1(a)                -2
    - • 3E1.1(b)                -1[5]
  - ▪ Total Offense Level                12

- o **Criminal History Calculation**
  - ▪ 4A1.3(b) Downward Departure for Criminal History
    - • 8/20/16 conviction        0 points
    - • 9/30/22 conviction        0 points
  - ▪ Total Criminal History Points    0
  - ▪ Criminal History Category        I

- o **Offense Level 12 and CHC I                10-16 months**

## III.    APPLICATION OF THE §3553(a) SENTENCING FACTORS

The primary directive in § 3553(a) is that the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with" the purposes of

---

[5] This additional negative point is only applicable if the Court applies the enhancement(s) in § 2J1.2.

sentencing. *See* 18 U.S.C. § 3553(a) (emphasis added). What follows is a detailed review of the relevant §3553(a) factors.

### A.    Mr. Connell's history and characteristics

Cody Connell was born in 1993 in Shreveport, Louisiana to parents ██████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

When he was eleven years old Cody was separated from his siblings and sent to his grandmother's house in East Texas. While it was good to get away from the unhealthy environment in his mother's home, it was very difficult to move away from his siblings and into a new community where he knew no one. Cody continued in school until he was 16 years old, at which point he dropped out and went to work. He first worked building houses, then for two years for a power company clearing vegetation under power lines.

Mr. Connell married Haven Hicks in 2011 and in 2012 they had a daughter,

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

Connell Letter, Exhibit 1.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████ Mr. Connell now lives with ██████ in Shreveport. Mr. Connell's girlfriend,

Misty Armstrong, reports that "Cody is an amazing father who makes sure ██████ has

everything she needs and could possibly want.  She truly believes her daddy hung the moon. The bond between these two is incredible." Letter of Misty Armstrong, attached as Exhibit 2.

Mr. Connell has worked his entire adult life, much of the time in the oilfield industry and owning and operating his own business that serviced electrical motors in Shreveport. He now works as a surface technician for a company called P.L.S. Rentals which rents and services above-ground equipment used in oil fields. According to Ms. Armstrong: "Even after a 12-16 hour typical day at work, he comes home to cook dinner and spend time with █████ and I before going to bed and doing it all over again the next day, all without a single complaint." *Id*.

**B.      The nature and circumstances of Mr. Connell's offense**

After the presidential election, former President Trump, members of his inner circle, and some members of the media began circulating the word that the election was "stolen." The false claims spread on media—from local news outlets, to Facebook, to some national broadcasts—that the election had been corrupted. Mr. Connell believed – because of what the President and other prominent politicians and media figures were saying – that the democratic process had been undermined by fraud. Below are examples of some of the political rhetoric that was spreading through the Trump supporter community prior to January 6, 2021 that came directly from former President Trump:

WE HAVE JUST BEGUN TO FIGHT!!!

***Tweet from Trump on December 12, 2022***.[6]

A great report by Peter. Statistically impossible to have lost the 2020 Election. Big protest in D.C. on January 6th. Be there, will be wild! ***Tweet from Trump on December 19***.[7]

The Justice Department and the FBI have done nothing about the 2020 Presidential Election Voter Fraud, the biggest SCAM in our nation's history, despite overwhelming evidence. They should be ashamed. History will remember. Never give up. See everyone in D.C. on January 6th.[8]
***Trump tweet from December 26, 2022***.

If you are planning to attend peaceful protests in D.C. on the 6th, I recommend wearing a body camera. The more video angles of that day the better.
***Retweet by Trump on January 3, 2022***.[9]

If the liberal Democrats take the Senate and the White House – and they're not taking this White House – we're going to fight like hell, I'll tell you right now,"…We're going to take it back."
***Trump's words at a rally in Georgia on January 4, 2021.***[10]

If Vice President @Mike_Pence comes through for us, we will win the Presidency. Many States want to decertify the mistake they made in certifying incorrect and even fraudulent numbers in a process NOT approved by their State Legislatures (which it must be). Mike can send it back!
***Tweet from former President Trump at 1:00 am on January 6, 2021.***[11]

---

[6] Sherman, Amy, *A Timeline of what Trump said before Jan. 6 Capitol riot*, Politifact, The Poyner Instititute, January 11, 2021, available at https://www.politifact.com/article/2021/jan/11/timeline-what-trump-said-jan-6-capitol-riot/

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *January 6 Report* at 61.

Like tens of millions of other Americans, Mr. Connell was a supporter of President Trump and followed his public comments attentively.[12]  When Mr. Connell's cousin Daniel Adams announced he was going to President Trump's "Stop the Steal" rally, Mr. Connell decided to join him.

On the morning of January 6 Mr. Connell listened to several speeches encouraging the crowd to march to the Capitol to "stand up for this country and stand up for what is right."[13] Former President Trump, after several minutes of reiterating his claims that the election was stolen, said the following to the crowd (including Mr. Connell) on January 6, 2021:

> We will not let them silence your voices. We're not going to let it happen, I'm not going to let it happen…..We're gathered together in the heart of our nation's capital for one very, very basic and simple reason – to save our democracy….Now, it is up to Congress to confront this egregious assault on our democracy. And after this, ***we're going to walk down, and I'll be there with you***, we're going to walk down…I know that everyone here will soon be marching over to the *Capitol building* to peacefully and patriotically make your voices heard….And they want to recertify their votes…**But the only way that can happen is if Mike**

---

[12] Judge Mehta of this Court has previously recognized that the false claims of a "stolen election" spread by prominent and trusted leaders can be a mitigating factor in some January 6 cases. In sentencing another defendant to probation for entering the Capitol, this Court stated:

> It really does, in my mind, go to the power of propaganda; the power of being told lies over and over and over again; told by leaders who knew better, that something was taken away from the people when it wasn't. . . people were told over and over again something that was not true, so much so that people like [the defendant] lost his way."

*United States v. Cavanaugh*, 21-CR-362, Sentencing Tr. p. 29 (sentencing defendant to 24 months' probation for entering the Capitol building).

[13] *See* Matthew Choi, *Trump is on trial for inciting an insurrection. What about the 12 people who spoke before him?*, Politico (Feb. 10, 2021), available at https://www.politico.com/news/2021/02/10/trump-impeachment-stop-the-steal-speakers-467554.

**Pence agrees to send it back…If not…you will have an illegitimate President.** That's what you'll have. And we can't let that happen…**We must stop the steal** and then we must ensure that such outrageous election fraud never happens again….**And we fight. We fight like hell**. **And if you don't fight like hell, you're not going to have a country anymore…..So we're going to, we're going to walk down Pennsylvania Avenue…And we're going to the Capitol, and we're going to try and give them the kind of pride and boldness that they need to take back our country.. So let's walk down Pennsylvania Ave**.[14]

Even as the Capitol building was under attack, President Trump did and said nothing for hours.[15] The only thing he did during the crucial hours of the attack was post a Tweet at 2:24 p.m. saying "Mike Pence didn't have the courage to do what should have been done to protect our country and our Constitution."[16]

   After the rally, Mr. Connell, along with Mr. Adams, followed the crowd to the Capitol. Mr. Connell approached the West Front of the Capitol building and moved through scaffolding that had been erected in advance of the inauguration, ultimately arriving at a landing on the Northwest steps. Several police officers were on the landing. Mr. Adams encouraged members of the crowd to push past these officers and members of the crowd, including Mr. Connell, did so. Getting up the stairs did not

---

[14] Associated Press, *Transcript of Trump's Speech at Rally Before US Capitol Riot*, U.S. News & World Report, Jan. 13, 2021, available at https://www.usnews.com/news/politics/articles/2021-01-13/transcript-of-trumps-speech-at-rally-before-us-capitol-riot. (emphases added).

[15] Jonathan Allen, *On Jan. 6, Trump ignored all pleas to call off the mob attacking the Capitol while 'pouring gasoline on fire' aide says*, NBC News, July 21, 2022, available at https://www.nbcnews.com/politics/congress/prime-time-jan-6-hearing-focuses-trumps-inaction-187-minutes-mayhem-rcna36737

[16] Ewan Palmer, *Donald Trump Tweeted Attack on Mike Pence Minutes After Hearing VP Was Fleeing Capitol Rioters*, Newsweek, February 11, 2021 available at https://www.newsweek.com/donald-trump-tweeted-attack-mike-pence-minutes-capitol-rioters-1568568. (last viewed on November 29, 2022).

involve an extended violent confrontation with officers; the officers retreated up the stairs once members of the crowd started moving past them. Mr. Connell and the rest of the crowd walked to the Senate Wing Door and saw rioters breaking windows in order to open the door to the Capitol, allowing those who were outside into the building.  Mr. Connell and Mr. Adams walked into the Capitol through the doors that had been opened by these people.

Importantly, Mr. Connell remained in the Capitol for only three minutes. Unlike thousands of others who roamed the building freely causing damage, scaring those who worked in the building, and entering the Senate Chamber, Mr. Connell walked out of the Capitol very soon after entering. He had not entered the building with a goal in mind. Unlike others present that day, Mr. Connell did not go to the Capitol wearing military attire. He did not have a helmet or protective clothing. He did not have anything that could be used as a weapon. He was not seeking to reach the Senate Chamber. He was not looking for particular legislators. He made an extremely poor decision in the heat of the moment to enter the building, but he quickly left.

The government has pointed to social media posts by Mr. Connell in the hours and days after January 6. Mr. Connell acknowledges that, like many others present on January 6, he made statements afterwards that were out of character and were in tune with the apocalyptic and chest-thumping language coming from the then-President and his supporters both on television and online. With distance from those days, Mr. Connell now sees that he got carried away. He never had any real plan to

go back to Washington, D.C. Proof of this comes from his conduct over the past two years. Unlike others present at the Capitol on January 6, he has not denied responsibility, he has not made further statements denying the legitimacy of the election or of his prosecution, and he has been entirely respectful throughout this process. This is so because he recognizes that his conduct was wrong and he has moved on.

Mr. Connell is genuinely remorseful for his conduct on January 6.  In his letter to the Court, he writes:

> I would like to express great remorse for my actions made on January 6th, 2021 at the United States Capitol. Among those affected by my decisions include but are not limited to the police officers, who dedicate their lives to protect and serve their citizens. I should not have behaved that way. My decision to go to the Capitol and my actions were impulsive and took place at a time when I was focused on the election and problems I was hearing about how it was handled. In hindsight I did not think enough about how what I was doing was wrong.

Letter of Cody Connell, attached as Exhibit 1.  The most important thing in Mr. Connell's life at this point is not Donald Trump or the election.  It is his daughter.

## C.    Avoiding disparities

It is difficult to identify defendants who engaged in the exact same conduct as Mr. Connell who were charged with, and convicted of, the same offenses. This is because the charges filed, pleas offered, and sentences sought by the government in January 6 cases have not been consistent or based upon a clear set of standards. Indeed, people who made physical contact with police or engaged in far more serious conduct than Mr. Connell have not been charged with assault or obstruction of justice or have been permitted to plead to lesser charges. The defense here provides examples

of defendants previously sentenced by this Court to offer guidance and demonstrate why a lengthy prison sentence here would result in unwarranted disparities.

### *United States v. Phillip Bromley, No. 21-250 (PLF)*

Prior to January 6, Mr. Bromley communicated with family and friends in violent terms, describing the need for war, killing "commie bastards," and that the "penalty for treason is death."  In the days prior to January 6, he wrote: "They don't have enough police or bullets to stop us." ECF No. 42. On January 6, Bromley approached the East front entrance of the Capitol, screamed at officers, and participated in an assault on officers attempting to move them from the doorway. Bromley then gave his cousin a metal object that he used to try to breach doors into the Capitol.  Bromley entered the Capitol when rioters who were inside the building were able to open the doors from the inside. He texted his wife: "We have stormed the capital!"  Bromley walked all the way to the entrance to the speaker's lobby, where he witnessed Ashlii Babbitt being fatally shot. During a post-arrest interview, Bromley minimized his conduct, claimed that he had not seen significant violence, that police were not blocking the door he entered, and that he had not participated in destroying or damaging anything at the Capitol.  He also hid evidence on his cell phone when interviewed by law enforcement. This Court imposed a sentence of 3 months' incarceration, 12 months of supervised release, and a $4,000 fine.

### *United States v. Jeramiah Caplinger, No. 21-342 (PLF)*

Mr. Caplinger wore body armor to the Capitol.  He scaled a wall of the Capitol to reach the Upper Terrace.  He walked throughout the Capitol, including to the suite

of offices belonging to Speaker Pelosi. He gave interviews to the press afterwards demonstrating a lack of remorse, and he downplayed his actions and omitted information during an interview with the FBI. ECF No. 46. This Court sentenced Mr. Caplinger to 35 days' incarceration, 24 months' probation, and 60 hours of community service.

### *United States v. Daniel Warmus, No. 21-417 (PLF)*

Mr. Warmus climbed the Northwest stairs to the Upper West Terrace around the time Mr. Connell did so. He then entered the Capitol through the Senate Wing Door at 2:17 p.m., approximately four minutes after Mr. Connell. He traveled much more extensively within the Capitol than Mr. Connell and was among the first rioters to reach the Rotunda. Once inside, he encouraged other rioters trying to break into the building.  He spent 16 minutes inside the Capitol – much longer than Mr. Connell. This Court sentenced Mr. Warmus to 45 days' incarceration, 24 months' probation, and 60 hours' community service.

### *United States v. Vaughn Gordon, No. 21-99 (PLF)*

Prior to January 6, Mr. Gordon made comments on social media stating that he would be coming to Washington, D.C. "in the front without fear of death or consequence."  He later wrote: "I fully expect this to get ugly."  Mr. Gordon entered the Capitol through the same Senate Wing door that Mr. Connell did. He was then part of a group that pushed past police officers in the Rotunda. He spent a full hour inside the Capitol building and bragged about it in the days afterwards.  ECF No. 46.

This Court sentenced Mr. Gordon to 3 months' home detention, 36 months' probation, and 90 hours of community service.

### *United States v. Anthony Puma, No. 21-454 (PLF)*

Prior to January 6, Mr. Puma posted on Facebook about starting to "kill[] commie bastards," that "war is coming," and that he hoped that they would "storm the House of Representatives."  ECF No. 55. On January 6, he scaled a wall on the Capitol's west side, urged other rioters forward, and entered the Capitol through a shattered window at the Senate Wing Door. After being forced out of the Capitol he remained on Capitol grounds until nighttime. Then on January 10, Mr. Puma wrote to a friend "Watch what is to come in the next two weeks to month.  It will shock the world." Mr. Puma entered a plea to obstruction of an official proceeding. The government sought the +3 § 2J1.2(a) enhancement for substantial interference with the administration of justice but not the +8 enhancement. The court imposed a sentence of 9 months' incarceration and 24 months of supervised release.

### D.    The need to provide just punishment and deterrence

Given the consequences Mr. Connell has already endured due to his conduct, adding a lengthy prison term in this case would be overly harsh.

> People are all very quick to suggest that the only real punishment is a jail sentence, and it's just not true. People can suffer in many different ways and do suffer in many different ways a result of their conduct and that is something every judge, at least on this court, I believe, understands, and takes into account when they're fashioning the appropriate sentence.[17]

---

[17] Quote from the Honorable Amit P. Mehta, *United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at p. 29.

Among the most significant consequences of these convictions for Mr. Connell will be the lifetime bar on firearms possession. Mr. Connell grew up in a hunting culture and his favorite pastime was hunting for deer and ducks. As an adult, he has developed a stronger bond with his father and he regularly went on hunting trips with his father and brothers. Those days will no longer be possible for Mr. Connell for the rest of his life. For those of us who do not hunt, the bar on firearms possession might seem inconsequential. For Mr. Connell it is a devastating loss.

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. *See* 18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010). Specific deterrence is obtained for the defendant by the prosecution and conviction itself. The personal and reputational consequences Mr. Connell has suffered are more than sufficient to discourage him from engaging in similar conduct.

As for general deterrence, the prosecution itself (and the publicity of conviction) all serve as a significant general deterrence. *See, e.g., Wayte v. United States*, 470 U.S. 598, 607 (1985) (observing that any prosecution has a "general deterrence value"); *United States v. Gamarra*, 940 F.3d 1315, 1321 (D.C. Cir. 2019) (observing that prosecution itself provides general deterrence). Sentencing Mr. Connell to years in prison for entering the Capitol is not the salve that the country needs to ensure that January 6 was an isolated horror, particularly taking into account the consequences he has already faced for his conduct and the difficulties his

daughter will face if her father is taken away. Empirical evidence proves that the certainty of prosecution, rather than the severity of punishment is the greater deterrent.[18]

### E.    Restitution

Restitution is a punishment in and of itself. *See United States v. Cohen*, 459 F.3d 490, 496 (4th Cir. 2006) ("[R]estitution is […] part of the criminal defendant's sentence."). Mr. Connell works long hours to support himself and his daughter. He is an hourly-wage worker. No matter what sentence the Court imposes, Mr. Connell will struggle to pay restitution when he is released. A sentence that will enable Mr. Connell to begin working again sooner rather than later so that he can start to make a dent in restitution will recognize that restitution for someone in Mr. Connell's position is far more punitive than it would be for someone with means.

### CONCLUSION

For the foregoing reasons and such others as may be presented at the sentencing hearing, Mr. Connell respectfully requests that the Court impose a short custodial sentence and 36 months of supervised release. A long custodial sentence would have a devastating impact on Mr. Connell and his daughter in particular.

Respectfully submitted,

/s/

_____
NED SMOCK
Assistant Federal Public Defender

---

[18] *See* National Institute of Justice, *Five Things About Deterrence* (June 5, 2016), full article available at https://nij.ojp.gov/topics/articles/five-things-about-deterrence