**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-CR-84 (PLF)** |
| **CODY PAGE CARTER CONNELL &** **DANIEL PAGE ADAMS** | |
| **Defendants.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Cody Page Carter Connell and Daniel Page Adams to 51 months of incarceration, three years of supervised release, $2,000 in restitution, and a mandatory assessment of $360.

## I.    INTRODUCTION

The defendants, Cody Page Carter Connell and Daniel Page Adams, are cousins from, respectively, Louisiana and Texas. Together, they participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution

1

Connell and Daniel Adams led the charge of rioters into a key area of the United States Capitol on January 6, 2021. They opened the Northwest Steps by assaulting five vastly outnumbered officers until they retreated. They were two of the first rioters to enter the Capitol Building, with Connell personally opening the Senate Wing doors to the Capitol for the flow of rioters while Adams cheered on. As they watched hundreds of other rioters pour into the seat of government in an effort to halt the transfer of presidential power, Connell and Adams *knew* the role that they had played. Connell also presented a danger moving forward as he planned to return to D.C. with firearms and body armor on Inauguration Day, and he was not going home unless it was in a "body bag."

The government recommends that the Court sentence both Connell and Adams to an above-guideline 51 months of incarceration. A 51-month sentence reflects the gravity of their conduct and the fact that their calculated guidelines ranges understate the seriousness of their offenses.

## II.    FACTUAL & PROCEDURAL BACKGROUND

### A.    Connell & Adams' Participation in the January 6, 2021, Riot

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 100 at 5-12, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. The government has previously set forth the detailed facts that gave

---

amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

rise to the defendants' convictions. ECF 81 at 2-4; ECF 110 at 2-19. To avoid unnecessary repetition, the government again relies on those facts, all of which remain relevant to this sentencing. *See* U.S.S.G. § 1B1.3(a)(1)(A) (For purposes of determining the sentencing guidelines, offense conduct under Chapter Two and adjustments under Chapter Three "shall be determined on the basis of […] all acts and omission committed, aided, abetted, counseled, commanded, induced, procured, or willfully cause by the defendant[.]").[2]

---

[2] First, the facts that led to the defendants' conviction on Count Two are relevant to the elements of other counts of conviction. The defendants were convicted of violating 18 U.S.C. § 1752(a)(2) and 40 U.S.C. § 5104(e)(2)(D), both of which required the government to prove beyond a reasonable doubt that the defendants engaged in disorderly or disruptive conduct with, respectively, the intent to disrupt "Government business or official functions [in] any restricted building or grounds" and the "intent to impede, disrupt, or disturb the orderly conduct of a session of Congress[] at any place in the Grounds or in any of the Capitol Buildings." The facts included in the PSR, such as the defendants' discussion of the joint session of Congress and their intent to disrupt it, their beliefs surrounding the 2020 election, the lengths to which they went to breach the building, the fear that their conduct caused to elected officials, and their preparations for further violence including discussions of a "second civil war," are thus relevant offense conduct to Counts Five and Six because they go to specific elements of those offenses.

Second, these same facts are relevant to the defendants' convictions under 18 U.S.C. §§ 111(a)(1) and 231(a)(3). The defendants' violent conduct at the United States Capitol on January 6, 2021, must be viewed in the context of the riot, directed at Capitol building and the officials who gathered there to certify the election results. The defendants assaulted USCP Officers J.G., T.M, B.S., B.M, and J.D. during a violent riot because they knew that those officers were standing between them and the joint session of Congress. The defendants' assaultive conduct during the riot was motivated by their desire to interfere with the official proceedings and is thus inextricably intertwined with their intent to disrupt the congressional proceedings that day. For instance, Adams sent a message stating that he estimated he "put down" four police officers and that "[e]very time an elected official operates outside the boundaries of the constitution we need to burn this motherfucker down until they start arresting people." ECF 120 at ¶ 39. Similarly, Connell stated that he knew that congressmen and women were scared because "they didn't expect a couple of ole southern boys to get through all them damn police and knock the doors down." ECF 118 at ¶ 38. Thus, conduct that would have been encompassed by a conviction for obstruction of an official proceeding is still relevant under U.S.S.G. § 1B1.3 because these acts were committed by the defendants in furtherance of committing civil disorder and assaulting police.

However, in summary for the purposes of this supplemental memorandum, in the early stages of the riot the defendants were present at nearly all of the major breach points. At 1:48 p.m., the crowd overwhelmed a group of officers who were protecting the entrance to the Northwest Steps, around which scaffolding had been constructed for the upcoming inauguration. Shortly after these officers were overrun by the mob, Connell and Adams entered the area underneath the scaffolding where Connell sent a picture message to a friend in which he acknowledged that he was being "tear gassed." After spending twenty minutes underneath the scaffolding, Connell and Adams made their way to the head of column of rioters that had amassed on the Northwest Steps before being halted by a group of five United States Capitol Police officers who were preventing the rioters from advancing beyond a landing at the midpoint of the steps. On this landing, Adams rallied the crowd around him by asking if they were ready to push against the officers before yelling harassments at those officers. But, at 2:08 p.m., upon seeing a weak point in the police line that another rioter created by spraying an officer in the face with chemical irritants, Adams yelled "Let's go!" to the crowd and charged the five police officers who were holding the mob at bay. Two minutes later, Connell and Adams were again at the head of the mass of rioters who were overwhelming the last line of bike rack barricades and officers at the top of the Northwest Steps. Despite one of these officers striking Adams in the head with a baton as the crowd surged past the final barricades, the pair continued their advance to the building as blood flowed from Adams' head. Moments later, Connell and Adams were in front of the Senate Wing Door, cheering on other rioters as they smashed through the windows and kicked open the door. Adams, with blood now covering his face, bellowed, "This is my house!" as Connell pulled open the Senate Wing Door.

Connell and Adams were not in the Capitol long, leaving less than ten minutes after entering. Together, they descended back down the Northwest Steps. At the base of the steps, Adams shouted to the crowd, "That door is open!" and indicated up to the Senate Wing Door. The effect on the crowd was immediate and people at the base of the Northwest Steps began discussing their intent to enter the Capitol through the door that Connell and Adams helped breach.

In the hours and days after the riot, Connel and Adams made numerous statements on social media in which they boasted about how they helped to overwhelm officers on the Northwest Steps, led the charge into the building, "put down" multiple police officers, and helped to breach the building. Connell discussed with other individuals on Facebook his intent to return to Washington for the upcoming inauguration with firearms. Adams took efforts to obstruct the investigation by deleting his Facebook and destroying his cell phone by throwing it in a lake.

### B.    Procedural History

On January 16, 2021, Connell and Adams were arrested on a criminal complaint. On November 10, 2021, the grand jury returned a second superseding indictment against Connell and Adams, charging them with violations of 18 U.S.C. § 231(a)(3), 18 U.S.C. § 1512(c)(2) and 2, 18 U.S.C. § 111(a), 18 U.S.C. § 1752(a)(1) and (2), and 40 U.S.C. § 5104(e)(2)(D), (E), and (G). On July 27, 2023, both defendants waived their right to indictment by a grand jury and the government filed an information charging the same offenses with the exception of 40 U.S.C. § 5104(e)(2)(E). The parties proceeded by way of a stipulated trial. On July 28, 2023, this Court convicted Connell and Adams of all of charges on the information. The Court set sentencing for November 29, 2023,

and then to January 9, 2024, based on scheduling conflicts.

On December 13, 2023, the Supreme Court granted certiorari in *Fischer v. United States*. 64 F.4th 329 (D.C. Cir. 2023), *cert. granted*, 144 S. Ct. 537, 217 L. Ed. 2d 285 (2023), and *vacated and remanded*, 144 S. Ct. 2176 (2024), and *cert. granted, judgment vacated sub nom. Miller v. United States*, No. 23-94, 2024 WL 3259658 (U.S. July 2, 2024), and *cert. granted, judgment vacated sub nom. Lang v. United States*, No. 23-32, 2024 WL 3259659 (U.S. July 2, 2024); *United States v. Fischer*, 21-CR-00234 (CJN), 2022 WL 782413, at *1 (D.D.C. Mar. 15, 2022), *rev'd and remanded*, 64 F.4th 329 (D.C. Cir. 2023), *cert. granted*, 144 S. Ct. 537, 217 L. Ed. 2d 285 (2023), and *vacated and remanded*, 144 S. Ct. 2176 (2024). Based on the pendency of *Fischer*, the defendants moved to continue their sentencing date, *see* ECF 126, and the government opposed, *see* ECF 127. After consideration of the defendants' motion to continue, the Court directed the parties to submit supplemental briefing and to appear for sentencing on March 12, 2024. *See* ECF 129 at 1; *see also* Minute Order, 1/29/2024.

On March 1, 2024, the United States Court of Appeals for the District of Columbia decided *United States v. Brock*, 94 F.4th 39, which limited the application of U.S.S.G. §§ 2J2.2 (b)(1)(B) and (b)(2) to the defendants' convictions on Count Two. Following *Brock*, the parties jointly moved to continue sentencing until after the Supreme Court decided *Fischer*. On June 28, 2024, the Supreme Court issued its decision in *Fischer*, 144 S. Ct. 2176, which held that Section 1512(c) does not cover "all means of obstructing, influencing, or impeding any official proceeding," *id.* at 2185. The Court explained that the government must establish that the defendant impaired the availability or integrity for use in an official proceeding of records, documents, objects, or other

things used in the proceeding—such as witness testimony or intangible information—or attempted to do so. *See id.* at 2190.

In light of *Fischer*, the defendants moved to have this Court "reconsider" their convictions on Count Two. *See* ECF 144 at 1-4. The defendants also moved for the Court to reconsider their convictions on Counts Four and Five based on *United States v. Griffin*, which was then pending before the Circuit.[3] ECF 144 at 5-7. The government opposed the defendants' motion for reconsideration, ECF 145 at 1-6, but agreed that the defendants' convictions on Count Two should be vacated, *id.* at 6-7 and 10-11. The government also opposed the defendants' motion for reconsideration on Counts Four and Five. *Id.* at 8-10 and 11-13. On August 28, 2024, the Court vacated the defendants' convictions on Count Two but denied their motions for reconsideration on Counts Four and Five. Due to a procedural issue, the Court continued sentencing to December 10, 2024. Following the 2024 presidential election, the defendants jointly moved to continue their sentencing, ECF 155, the government opposed, ECF 156, and the Court denied their request, ECF 157. Sentencing remains set for December 10, 2024.

### III.    STATUTORY PENALTIES

The maximum penalties for each of Connell's count of conviction are set forth in his revised PSR at ¶¶ 122-128. The maximum penalties for each of Adams' counts of conviction are set forth in his PSR at ¶¶ 131-137.

---

[3] *Griffin* has since been decided. *See* 119 F.4th 1001 (D.C Cir. October 22, 2024).

### IV.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). Following the vacatur of the defendants' convictions on Count Two, the new guidelines for both defendants are:

**Count One: 18 U.S.C. § 231(a)(3) – Civil Disorder**

Since there is no applicable Chapter Two Guideline for this offense in the Statutory Appendix, use "the most analogous guideline." U.S.S.G. § 2X5.1. Here, that is U.S.S.G. § 2A2.2.

| | | |
|---|---|---|
| Base Offense Level | 10 | U.S.S.G. §2A2.4. |
| Specific Offense Characteristic (Physical Contact) | +3 | U.S.S.G. § 2A2.4(b)(1) – If the offense involved physical contact, […] increase by 3 levels.<br><br>Connell and Adams made physical contact with USCP Officers J.G., T.M., B.S., B.M., and J.D. |
| Cross-Reference: | | U.S.S.G. § 2A2.4(c): "If the conduct constituted aggravated assault, apply U.S.S.G. § 2A2.2(a) (Aggravated Assault)."<br><br>The Application Notes to Section 2A2.2 define "aggravated assault" as a "felonious assault that involved … (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; … or (D) an intent to commit another felony." U.S.S.G. §2A2.2 cmt n. 1.<br>As the D.C. Circuit has recently held, Connell and Adams conduct constituted aggravated assault because they were felonious assaults that involved the intent to commit another felony (Civil Disorder). U.S.S.G. § 2A2.2, cmt. n.1. Therefore, the cross-reference to U.S.S.G. §2A2.2 applies. See *United States v. Stevens*, 105 F.4th 473, 479 (D.C. Cir. 2024) ("The commentary definition of 'aggravated assault unambiguously covers Stevens' conduct—namely, assaulting, impeding and resisting officers under Section 111(a)(1) with an intent to commit |

| | | |
|---|---|---|
| | | civil disorder under Section 231(a)(3).") (citing *See United States v. Sargent*, 103 F.4th 820, 825–26 (D.C. Cir. 2024). |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) Aggravated Assault |
| Specific Offense Characteristic – Official Victim | +6 | U.S.S.G. § 3A1.2(b): "If the victim was a government officer or employee" then "increase by six levels."<br><br>Officers J.G., T.M., B.S., B.M., and J.D. were USCP officers in full uniform that day and plainly engaged in the course of their official duties defending the Northwest Steps of the United States Capitol. |
| Total | 20 | |

**Count Three: 18 U.S.C. § 111(a)(1) – Assaulting, Obstructing, Interfering, or Impeding Certain Officers (USCP Officers J.G., T.M., B.S., B.M., and J.D.)**

The Statutory Index lists two guidelines for a Section 111 offense, U.S.S.G. § 2A2.2 (Aggravated Assault) and U.S.S.G §2A2.4 (Obstructing or Impeding Officers). The guidelines direct that, if Appendix A lists more than one guideline, use the "most appropriate" guideline for the offense conduct charged in the count of conviction. *See* §1B1.2 n.1. Here, that is U.S.S.G. § 2A2.2.

| | | |
|---|---|---|
| Base Offense Level | 10 | U.S.S.G. §2A2.4. |
| Specific Offense Characteristic (Physical Contact) | +3 | U.S.S.G. § 2A2.4(b)(1) – If the offense involved physical contact, […] increase by 3 levels.<br><br>Connell and Adams made physical contact with USCP Officers J.G., T.M., B.S., B.M., and J.D. |
| Cross-Reference: | | U.S.S.G. §2A2.4(c) – the relevant conduct here is assault, so we apply §2A2.2. *Sargent*, 103 F.4th at 827-828; *see also Stevens*, 105 F.4th at 480.<br><br>Section 2A2.2 defines "aggravated assault" as a "felonious assault that involved . . . (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; . . . or (D) an intent to commit another felony."  U.S.S.G. § 2A2.2 cmt. n.1. |

|  |  | Connell and Adams conduct was aggravated assault because was committed with the intent to commit another felony, namely, to obstruct an officer during a civil disorder in violation of 18 U.S.C. § 231(a)(3). |
|---|---|---|
| Base Offense Level | 14 | U.S.S.G. § 2A2.2 |
| Adjustment: Official Victim | +6 | U.S.S.G. § 3A1.2(b): "If the victim was a government officer or employee" then "increase by six levels." |
| Total | 20 |  |

**Count Four: 18 U.S.C. § 1752(a)(1) - Entering and Remaining in a Restricted Building or Grounds**

The Statutory Appendix lists two potentially applicable guidelines provisions for a Section 1752 offense: U.S.S.G. §2A2.4 (Obstructing or Impeding Officers) and U.S.S.G. § 2B2.3 (Trespass). The Introduction to the Appendix states that, if "more than one guideline is referenced for a particular statute, use the guideline most appropriate for offense conduct." Here, U.S.S.G. § 2B2.3, which applies to trespass offenses, is the most appropriate guideline for 18 U.S.C. § 1752(a)(1).

| Base Offense Level | 4 | U.S.S.G. §2B2.3(a) |
|---|---|---|
| Specific Offense Characteristic | +2 | U.S.S.G. §2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted building or grounds." |
| Cross Reference |  | U.S.S.G. §2B2.3(c)(1) ("If the offense was committed with the intent to commit a felony offense, apply § 2X1.1(a) (Attempt, Solicitation, or Conspiracy) in respect to that felony offense, if the resulting offense level is greater than that determined above.") |
| Base Offense Level | 14 | U.S.S.G. § 2X1.1: "the base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty."<br><br>The defendants' trespass was committed with the intent to commit the felony offense of Civil Disorder charged in |

| | | Count One. |
|---|---|---|
| Total | 14 | |

**Count Five: 18 U.S.C. § 1752(a)(2) - Disorderly and Disruptive Conduct in a Restricted Building or Grounds**

The Statutory Appendix lists two potentially applicable guidelines provisions for a Section 1752 offense: U.S.S.G. §2A2.4 (Obstructing or Impeding Officers) and U.S.S.G. § 2B2.3 (Trespass). The Introduction to the Appendix states that, if "more than one guideline is referenced for a particular statute, use the guideline most appropriate for offense conduct." Here, U.S.S.G. § 2A2.4, which applies to assault offenses, is the most appropriate guideline for 18 U.S.C. § 1752(a)(2).

| Base Offense Level: | 10 | U.S.S.G. §2A2.4(a) |
|---|---|---|
| Specific Offense Characteristic | +3 | U.S.S.G. § 2A2.4(b)(1) "If (A) the offense involved physical contact … increase by 3 levels." <br><br> The defendants made physical contact with USCP Officers J.G., T.M., B.S., B.M., and J.D when they pushed and shoved them on the Northwest Stairs. |
| Cross reference | | U.S.S.G. § 2A2.4(c): "If the conduct constituted aggravated assault, apply U.S.S.G. § 2A2.2(a) (Aggravated Assault)." <br><br> *See* the discussion above regarding application of the aggravated assault guideline for Count 2. |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) Aggravated Assault |
| Total | 14 | |

The sentencing guidelines do not apply to Counts Six and Seven because those offenses are Class B misdemeanors.

**Grouping Analysis**

Under U.S.S.G. § 3D1.2, "closely related counts" group.

11

Group One: Counts 4 and 5 group because they involve the same victim—Congress—and similar acts "connected by a common criminal objective"—to stop the certification of the Electoral College vote. U.S.S.G. § 3D1.2. The Offense Level for this group is 14.

Group Two: Counts 1 and 3 group because they involve the same victims, USCP Officers J.G., T.M., B.S., B.M., and J.D. The offense level for the group is 20.

One unit is assigned to Group Two since it is the Group with the highest offense level. U.S.S.G. § 3D1.4(a). One half unit is assigned to Group One since it is six levels lower than Group Two. U.S.S.G. § 3D1.4(b). Because one level is added to the group with the highest offense level, the Combined Offense Level is 21. U.S.S.G. § 3D1.4.

1. *Connell's Guidelines Calculation*

The U.S. Probation Office correctly calculated Connell's criminal history as Category II. ECF 118 at PSR ¶ 78. In light of Connell's agreement to proceed with a stipulated trial in which he agreed to all of his conduct underlying each element of every charge he faced, Connell qualifies for a two-point reduction of his offense score for acceptance of responsibility under Section 3E1.1(a). Likewise, the government submits that a third-point reduction is appropriate under Section 3E1.1(b). As a result, Connell's final offense level is 18 with a corresponding Guidelines range of 30-37 months' imprisonment.

2. *Adams's Guidelines Calculation*

The Probation Office correctly applied a two-level increase in Adams' offense level pursuant to U.S.S.G. § 3C1.1, ECF 120 at ¶ 69. The two-level increase was based on Adams early efforts to obstruct the investigation and prosecution of this case before he was arrested by

destroying his phone and deleting his Facebook account. *See id.* at ¶¶ 40a; *see also* ECF 110 at 24. The two-level increase was also appropriate based on the fact that Adams lied in his custodial interview with the FBI following his arrest in January 2021. *See* ECF 120 at ¶ 40b. By destroying his phone, attempting to destroy records from his Facebook account, and lying to the FBI, Adams "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense[s] of conviction." U.S.S.G. § 3C1.1. Therefore, a two-level increase remains appropriate, yielding a Guidelines score of 23 for Adams before any reduction for acceptance of responsibility.

Conduct resulting in an obstruction of justice adjustment can co-exist with acceptance of responsibility "in extraordinary cases." U.S.S.G. § 3E1.1 cmt n.4. Adams' case is such an "extraordinary case." "In evaluating whether [a defendant's] case was an 'extraordinary' one, [the court] must look at the relationship between his obstructive conduct and his acceptance of responsibility." *United States v. Gregory*, 315 F.3d 637, 640 (6th Cir. 2003). Where the obstructive conduct pre-dated the acceptance of responsibility, the acceptance adjustment may apply. *See id.*; *United States v. Hopper*, 27 F.3d 378, 383 (9th Cir. 1994). Here, the obstructive conduct all predates Adams's agreement to a stipulated trial, and Adams admitted to the conduct that provides the basis for the obstruction of justice enhancement during a voluntary debriefing. Adams also has largely cooperated with the government's investigation after his initial omissions, minimizations, and lies.

The PSR correctly calculated Adams' criminal history as Category I. ECF 120 at ¶ 76. Ultimately, then, Adams faces an offense score of 20 with a Guidelines range of 33-41 months of incarceration.

### Upward Departure and Variance

After determining the defendant's Guidelines range, a court then considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c). Because the defendants' guidelines ranges do not capture the unprecedented and uniquely harmful nature of their crimes, which struck at the heart of our democracy and the rule of law, the government respectfully requests that the Court depart or vary upwards from the top of the Guidelines range.

Connell and Adams were avid and willing participants in an unprecedented crime that shattered norms and has forever changed our history. They joined a mob that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, injured more than one hundred police officers and resulted in more than 2.9 million dollars in losses. An upward variance is appropriate because of the severity of the defendants' actions on the Northwest Stairs and the direct consequences those actions had on January 6 becoming what it was. *See* ECF 110 at 27-29.

Connell and Adams were at the head of a column of thousands of rioters who were being held on the Northwest Stairs by a small group of officers. By rallying this crowd to assault the officers and finish the drive up the steps, Connell and Adams opened the Upper West Terrace, and eventually the Capitol building itself, to the riot. The 2:13 p.m. breach of the Senate Wing Doors was a direct consequence of their charge and assault against the officers on the Northwest Stairs.

That initial breach, in which Connell and Adams were an instrumental part, was what caused the Congressional proceeding to certify the Electoral College vote to be suspended and Vice President Pence to be rushed out of the Senate Chamber to safety.

Like every member of the mob, Connell and Adams "endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work." *United States v. Brock*, 94 F.4th 39, 59 (D.C. Cir. 2024). As Judge McFadden put it to another rioter, "[Y]ou and your fellow rioters were responsible for substantially interfering with the certification, causing a multiple-hour delay, numerous law enforcement injuries and the expenditure of extensive resources." *United States v. Hale-Cusanelli*, 21-CR-37 (TNM), Sent. Tr. 9/22/22 at 86-87.

But nothing in the Connell and Adams' Guidelines calculations reflects these facts. They would face the same offense level if their crimes had not endangered the democratic process or interfered with the peaceful transfer of power.[4] There is no specific offense characteristic in the Guidelines for attacking democracy or abandoning the rule of law. "And simply saying, yeah, I know I trespassed, I trespassed, that's not really capturing the impact of what that day meant when all of those members of Congress met there to fulfill their constitutional duty." *United States v.*

---

[4] The D.C. Circuit's holding in *United States v. Brock*, 94 F.4th 39 (D.C. Cir. 2024), finding that certain sentencing enhancements did not apply to the Congress's counting and certification of the electoral college votes, despite acknowledging that interference with this process "no doubt endanger[ed] our democratic process and temporarily derail[ed] Congress's constitutional work" demonstrates that the Sentencing Commission failed to anticipate anything like the January 6 riot when drafting the Guidelines. And the Supreme Court's recent decision in *United States v. Fischer*, 144 S.Ct. 2176 (2024), demonstrates that even the criminal code lacks the appropriate tools to fully address the crimes of January 6. *See Fischer*, slip op. at 29 (Barrett, J., dissenting) ("Who could blame Congress for [its] failure of imagination?").

*Calhoun*, 21-CR-116 (DLF), Sent. Tr. at 85. A sentence within the Guidelines range here would not "reflect the seriousness of the offense," "promote respect for the law," or "provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

The Guidelines state that an upward departure is warranted where a case presents a circumstance that "may not have been adequately taken into consideration in determining the applicable guideline range" or that "the Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence." U.S.S.G. § 5K2.0(a)(2). The Guidelines also provide that a departure is warranted when an offense results in "a significant disruption of a governmental function" and the Guidelines do not reflect the appropriate punishment for the offense. U.S.S.G. § 5K2.7.[5] In such circumstances, "the court may increase the sentence above the authorized guideline range to [1] reflect the nature and extent of the disruption and [2] the importance of the governmental function affected."

It is not hyperbole to call what happened on January 6 a crime of historic magnitude. As judges of this district have repeatedly and clearly stated, January 6 was an unprecedented disruption of the nation's most sacred function—conducting the peaceful transfer of power. "The events that occurred at the Capitol on January 6th will be in the history books that our children read, our children's children read and their children's children read. It's part of the history of this nation, and it's a stain on the history of this nation." *United States v. Miller*, 21-CR-75 (RDM), Sent. Tr., at 67. The damage done to this country on January 6 must be reflected in the sentences

---

[5] This guideline does not require the government to establish a direct link between the defendant's misconduct and the alleged disruption, nor does it "require that the disruption be of any particular type or consequence." *See United States v. Saani*, 650 F.3d 761, 765–66, 771 (D.C. Cir. 2011).

imposed on those who caused the damage—it must not be treated as just another crime. Connell and Adams were determined to change the outcome of the democratic process by any means necessary, including violent force. Together with their fellow rioters, they chose to take matters into their own hands through acts of violence and intimidation. *See United States v. Wyatt*, 23-CR-215 (RDM), Sent. Tr. at 44.

But just as the history books will describe the crimes of January 6, so will they tell the story of how this nation responded. History is not just the measure of events and the dates on which they occurred; history is the measure of how a society and its leaders choose to respond to those events to provide security, prosperity, and freedom to its posterity and, in doing so, form a more perfect union. Future generations will rightly ask what this generation and those who have filled these courtrooms did to prevent another such attack on our democracy from occurring. The damage done to this country on January 6 must be reflected in the sentences imposed on those who caused the damage—it must not be treated as just another crime because it was not:

> "The effort undertaken by those who stormed the Capitol on January 6 […] was to stop the peaceful transfer of power following the legitimate outcome of our presidential election. That's a process that has been a hallmark of American democracy for 200 years. And that effort to reject the outcome of the 2020 presidential election involved an unprecedented and, quite frankly, deplorable attack on our democratic institutions, on the sacred ground of the United States Capitol building, and on the law enforcement officers who were bravely defending the Capitol and those democratic values against the mob of which the defendant was a part."

*United States v. Languerand*, 21-CR-353 (JDB), Sent. Tr., at 33-34.

Indeed, even before *Fischer*, judges of this Court gave significant upward departures and/or variances when they found the advisory guideline range inadequate. *See, e.g.*, *United States v.*

*Hale-Cusanelli*, 21-CR-37 (TNM), 9/22/22 Sent. Tr.; *United States v. Christian Secor*, 21-CR-157 (TNM), 10/19/22 Sent. Tr.; *United States v. Hunter and Kevin Seefried*, 21-CR-287 (TNM). 10/24/22 Sent. Tr.; *United States v. William Watson*, 21-CR-513 (RBW), 3/9/23 Sent. Tr.; *United States v. Riley Williams*, 21-CR-618 (ABJ), 3/23/23 Sent. Tr.; *United States v. Hatchet Speed*, 22-CR-244 (TNM), 5/8/23 Sent. Tr.

And several judges of this Court have upwardly departed in January 6 cases precisely because, in a post-*Fischer* world, the advisory guideline range did not adequately take into account all of the relevant circumstances. *See United States v. Eicher*, 22-cr-38 (BAH), 9/15/23 Sent. Tr. at 50 (applying § 5K2.7 because the defendant "join[ed] a mob, in the center of the melee, and through the sheer numbers and aggressive conduct towards police, breached the Capitol resulting in stopping the legitimate business of Congress for hours"); *United States v. Black*, 21-CR-127 (ABJ), 5/16/23 Sent. Tr. at 27 (applying an upward departure pursuant to § 5K2.7).

In August, in *United States v. Sparks*, 21-CR-87 (TJK), Judge Kelly sentenced a defendant convicted of violating both 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 231. Prior to sentencing and in light of the Supreme Court's *Fischer* decision, the government, as it will do in this case, moved to dismiss the § 1512(c)(2) count, and at sentencing, Sparks faced an advisory guideline range of 15-21 months. Judge Kelly found it important that despite the dismissal of the § 1512(c)(2) count, the defendant's conduct still included "an intent to obstruct or interfere with that proceeding, that important constitutional proceeding" which the court found to be "pretty dark behavior" which "posted a threat to whether our constitutional process will proceed or whether a mob would interfere with that process." *Sparks* Sent. Tr., at 87-88. The court found that the "typical person

18

convicted of [18 U.S.C. § 231] engaged in nothing at all like the attack on the Capitol and the certification." *Id*. at 94-95.

Because Sparks' advisory guideline range was driven by the § 231 conviction, that range did not "account for the defendant's intent to obstruct, not just law enforcement officers doing their duty under that statute, but a proceeding, or for the purposes of [U.S.S.G. §] 5K2.7, a governmental function. And not any proceeding, but one foundational to our country's governance." *Id.* at 93. The court found Sparks' intent to "interfere or obstruct with the electoral college vote certification . . . plays an important role in explaining why" Sparks' advisory guideline range did not fully account for his criminal conduct. *Id.* at 94. Accordingly, the court found a significant upward departure was warranted under both U.S.S.G. §§ 5K2.7 and § 5K2.21, and in the alternative a variance of equal amount was warranted under the § 3553(a) factors, and sentenced Sparks to 53 months of imprisonment.

Similarly, in *United States v. Robertson*, 21-CR-34 (CRC), Judge Cooper resentenced a defendant after dismissal of a § 1512(c)(2) conviction post-*Fischer*. Without that conviction, the court determined that a new advisory guideline range of 37 to 46 months applied. *See Robertson* Sent. Tr., at 59. But the court also found that an upward departure was appropriate pursuant to U.S.S.G. § 5K2.7, because Robertson's conduct "resulted in a significant disruption of a governmental function, namely halting of the certification . . . and that is so regardless of whether Section 1512(c) applies." *Id*. at 61. The court also found an upward departure appropriate under U.S.S.G. § 5K2.0 because Robertson's conduct was "more harmful or egregious than the typical case represented by the otherwise applicable guideline range." *Id*. After considering the § 3553(a)

factors, Judge Cooper sentenced Robertson to 72 months of imprisonment.

Because the seriousness of the defendants' crimes is not adequately captured by the applicable Guidelines, an upward departure is appropriate here. If the Court declines to depart, an upward variance is warranted. An upward variance is appropriate when "the defendant's conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range." *United States v. Murray*, 897 F.3d 298, 308–09 (D.C. Cir. 2018) (cleaned up).

While the Supreme Court's decision in *Fischer* has changed defendants' Guideline range, "*Fischer* does not dictate the Court's application of the 18 U.S.C. 3553(a) factors [because] the Court may still consider [defendant's] serious conduct on January 6th, 2021 in its entirety. To reduce [defendant's] sentence . . . would require this Court to take a drastically different view of [defendant's] conduct." *United States v. Hostetter*, 21-CR-392-RCL, ECF 507, at 4-5 (cleaned up). Indeed, "*Fischer* does not mean that I cannot consider at sentencing evidence that establishes that the defendant intended to obstruct Congress' certification of the electoral vote in determining whether . . . the resulting guideline range fully accounts for the criminal conduct." *Sparks* Sentencing Tr. at 95. *See also United States v. Kelly*, 21-CR-708-RCL, ECF 151, at 5 ("Nothing about *Fischer* or any hypothetical outcome of [defendant's] appeal bears directly on the severity of his conduct on January 6th . . . . Likewise, the outcome in *Fischer* would not dictate the Court's application of the sentencing factors prescribed in 18 U.S.C. § 3553(a)"); *United States v. Jensen*, 21-CR-6-TJK, Sent. Tr. at 16 ("given the importance and the significance of the proceeding of certifying the Electoral College votes, I would vary upward – even if this [sentencing enhancement] didn't apply, I would vary upward when considering the nature of the offense.")

Also unprecedented is the need for January 6 sentences to promote respect for the law and deter future crime. *See* 18 U.S.C. § 3553(a)(2)(A), (B). The January 6 rioters went far beyond merely breaking the law. "There is a difference between breaking the law and rejecting the rule of law." *See* Opening Remarks, January 6 Select Committee (Rep. Kinzinger).[6]

If we are to prevent another January 6 and restore respect for the rule of law, sentences in these cases must send a message, and that message will not be conveyed by treating the January 6 riot as a run-of-the-mill offense or an unexceptional event whose stark reality is easily forgotten or lost to history.

In addition to departing upwards, courts have varied upward from the advisory range specifically because of the unique and serious nature of the crimes committed that day; this Court should do no less. *See United States v. Reffitt,* 21-CR-87 (DLF), Mem. Op. and Order 4/10/24 at 10-11 (upward variance would be justified because "as other judges in this district have noted, the proceedings at issue on January 6, 2021 were of much greater significance than run-of-the-mill 'judicial, quasi-judicial, and adjunct investigative proceedings'"); *United States v. Fonticoba*, 21-CR-368 (TJK), Sent. Tr. 1/11/24 at 66–67 (stating that, even if the defendant's § 1512 conviction were invalidated, a significant upward variance was warranted to account for the defendant's intent "to obstruct the proceeding and the nature of the proceeding itself"); *United States v. Secor*, 21-CR-157 (TNM), Sent. Tr. 10/19/22 at 53 ("I believe both the seriousness of the event — you obstructed the certification of an official proceeding — and your particular role in it … require a significant upward variance"); *United States v. Hale-Cusanelli*, 21-CR-37 (TNM), Sent. Tr.

---

[6] Available at https://www.cnn.com/2021/07/27/politics/read-kinzinger-remarks-0727/index.html

9/22/22 at 87 ("I also believe the extensive damage and injuries caused on January 6th with your

fellow rioters require additional punishment beyond what my [guideline] calculation allows.").[7]

In this case, the government submits that an upward variance and/or departure of 14 months

for Connell and 10 months for Adams is warranted to reach an appropriate sentence. As discussed

below, similarly situated defendants have received sentences of around 50 months. Connell and

Adams' guidelines range understates the egregious nature of their conduct, the consequences that

conduct had on the riot, and the destabilizing effect that the riot and their part in it had on our

democratic order. Connell's and Adam's charge against the officers on the stairs and opening the

Upper West Terrace to rioters had two significant strategic implications. First, it removed the final

security layer protecting the Capitol Building's walls from the rioters, causing a stream of rioters

to mass around it searching for an entry point. Second, it had serious consequences for the several

hundred police officers who had established a defensive line on the West Plaza and had held that

line for approximately an hour in the face of thousands of angry rioters. Those officers were now

---

[7] The D.C. Circuit has made clear that it "ordinarily presume[s] a district court imposing an alternative non-guidelines sentence took into account all the factors listed in § 3553(a) and accorded them the appropriate significance." *United States v. Warren*, 700 F.3d 528, 533 (D.C. Cir. 2012) (quoting *United States v. Ayers*, 428 F.3d 312, 315 (D.C. Cir. 2005)). But as recently discussed in *United States v. Iracks*, 2024 WL 3308241 (D.C. Cir. July 5, 2024), for a sentence above the applicable Guidelines range, the Sentencing Reform Act provides that the district court must state "the specific reason for the imposition of a sentence different from that described [in the Guidelines,]" both orally during the sentencing and on a written form appended to the judgment. 18 U.S.C. § 3553(c)(2) (emphasis added). Accordingly, the government requests that the Court make specific findings that these defendants' "conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range" and "explain why the otherwise applicable Guidelines calculation 'does not fully account for the described criminal conduct.'" *United States v. Brown*, 892 F.3d 385, 404–05 (D.C. Cir. 2018) (quoting *Brown*, 808 F.3d at 867, 872 (D.C. Cir. 2015)).

surrounded. Having punctured that weakness on the edge of the line, the mob had gained a three-hundred and sixty-degree, elevated position over the police officers in the West Plaza below. The officers now had to contend with a crowd of thousands directly in front of them, as well as a rapidly swelling crowd above them, behind them, and flanking them. Because of Connell and Adams charged up the Northwest Stairs and helped to eliminate the officers who held that position, the larger police line in the West Plaza ultimately fell. With the police line overrun, rioters quickly took control of much of the West Front of the Capitol against the outnumbered officers. Having seized control of much of the West Front, rioters were able to breach new areas of the Capitol and—for nearly four hours—violently resist the efforts of police officers to both clear them from the building and prevent them from breaching new areas. With this riot raging and rioters flooding into the building, the certification of the 2020 presidential election had to be halted and the lawmakers inside the building evacuated, thus ending a 224-year tradition of peaceful transitions of power. *See Sparks*, 21-CR-87 (TJK), Sent. Tr. at 80. All of this can be traced back to the moment that Adams yelled "Let's go!" on the Northwest Stairs at 2:08 p.m. and charged against the officers on the landing with Connell following close behind.

The Court should therefore vary upward so that Connell and Adams' sentences adequately reflect the seriousness of their conduct and to send a clear message to those who would seek to undermine the democratic process with the brute force of mob violence.

**Government's Recommendation for Both Defendants**

For the above reasons, a sentence of 51 months, which was the government's recommendation in its original sentencing memorandum, see ECF 110 at 26-27, is warranted for both defendants. Their conduct, while different in certain respects, reflects a pair of defendants equal in culpability and conduct. Adams initiated the duo's travel plans and attendance in D.C. on January 6. He ultimately was the vocal leader on the steps when he harnessed Connell and the mob and led the charge forward against the officers. Connell joined Adams every step of the way and then took it further. He proposed an ongoing threat to the Republic by planning to return for violence on Inauguration Day. Every action that the pair took was in furtherance of violent political ends that have, to this day, endangered our nation and will continue to stain our history. Respectfully, the Court should sentence both Adams and Connell to 51 months, three years of supervised release, restitution of $2,000 and a mandatory assessment of $360.

## V.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

Connell's and Adams' respective conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. The attack on the Capitol was a norm shattering event that, by its very nature, defies comparison to other events in American history, much less isolated instances of criminal behavior

by individuals.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol or assaulted police on January 6 did so under the most extreme circumstances and their conduct directly contributed to those circumstances.   As a person entered the restricted area around the Capitol, they would—at a minimum—have passed numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed extensive fighting with police. In this case, there is no question that Connell and Adams saw officers being assault and overrun, barricades being trampled, and windows being smashed, because in many instances they were actively participating in these acts or documenting them, if not both.

The nature and circumstances of Connell's and Adam's particular crimes weigh in favor of a 51-month term of imprisonment. Together, they drove more than one-thousand miles to arrive in D.C. on the morning of January 6. After attending the "Stop the Steal" rally, they went to the Capitol where they quickly made their way to the head of the crowd and led the charge up the Northwest Stairs into the Northwest Courtyard.

The importance of Connell and Adams' leading the charge up the Northwest Stairs cannot be overstated. As discussed extensively above, Connell and Adams' conduct had dramatic effects on the riot and the ability of police officers to defend the Capitol. With their conduct, Connell and Adams opened the Capitol, both literally and figuratively, to a flood of rioters who were able to overwhelm the police and stop the democratic process. The nature and circumstances of their

offense weighs in favor of a 51-month term of incarceration.

**B.**     **The History and Characteristics of the Defendant**

Adams, who was forty-three years old on January 6, 2021, had one prior conviction from Texas in 2006. Adams PSR ¶ 76. Other than that conviction, until his participation in the January 6 riot, he had lived a productive life as a contributing member of society. However, Adams' wrongdoing did not end on January 6, 2021. During his initial FBI interview, Adams repeatedly lied and minimized to the interviewing agents. When confronted with the evidence against him or asked about specific video footage that showed him committing illegal acts at the Capitol, Adams repeatedly made statements to the effects of "I guess you'll have to see" and, after refusing to answer a question, "I think you know what that means." Adams also told the agents that he destroyed his phone and attempted to delete his Facebook page before the FBI could access it.

To be sure, Adams proffered multiple times with the government and eventually admitted that he assaulted multiple officers in an effort to get to the Capitol. And he, like Connell, agreed to a stipulated trial when confronted with an overwhelming amount of evidence of their actions, statements, and intent. But his initial efforts to obfuscate and mislead, his efforts to destroy evidence of his crimes, and the leadership role he took on January 6 with the pride he exhibited afterward all support a more sentence than similarly-situated individuals.

Connell, who was twenty-seven years old on January 6, 2021, has been arrested at least three times and has two criminal convictions. On October 17, 2016, Connell pled guilty to a charge of simple battery, in violation of La. Stat. Ann. § 14:35, and was sentenced to six months of incarceration in the Caddo Parish Jail. That prison sentence was suspended pending Connell's

successful completion of six months of supervised probation. On December 14, 2022, Connell pled guilty to criminal damage to property and was sentenced to a deferred sentence of three months of incarceration and six months of probation. Connell PSR ¶ 77. Connell thus similarly presents no additional mitigation.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Connell and Adams' assaults against five USCP officers on the Northwest Stairs showed not only a disregard and disrespect for law enforcement officials, but a willingness to engage in violent, illegal conduct to further their political ends. The evidence amply establishes that they committed these crimes in furtherance of their underlying motive to stop the transition of power between presidents. Because of their readiness to do violence at the head of the mob, they were temporarily successful as Congress was forced to recess at the moment that they entered the building. Connell and Adams were not merely disrespecting the law, they were active and eager participants in an attack on the bedrock principle of our republic. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that, as our nation and lawmakers prepare to certify the results of another hotly contested national election, this violent conduct and the motives that underlie it are not taken seriously. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

**D.      The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[8] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to these particular defendants weighs in favor of a term of a 51-month term of incarceration. As they began to make their journey home from D.C., Adams and Connell reveled in their crimes. They bragged to friends and family about their conduct, describing in detail the assaults that they committed against police officers. Adams, making specific reference to the electoral process going on in the building, proposed to "burn this motherfucker down" because his candidate had lost. Connell went a step further and, within hours after the January 6, 2021, attack on the Capitol, began discussing a return trip to the D.C., the need to come armed, and his readiness to engage in civil war.

During his interview with the FBI, Connell minimized some of his conduct and was not truthful given what he *knew* he had done as he articulated to others on Facebook. However, Connell's conduct during his FBI interview pales in comparison to what he discussed with others following January 6. Connell talked at length about stockpiling long rifles and body armor and

---

[8]  *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

returning to D.C. to violently stop President-elect Biden's Inauguration, both ready to and expecting to die in the process. If he actually intended to undertake that carnage, he was unable to do so because he was arrested on January 16.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted

29

disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[9] "When an offense is uniquely serious,

_____

[9] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-CR-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

In its original sentencing memorandum, the government cited two cases as comparators: *United States v. Rubenacker*, 21-CR-193 (BAH) (defendant sentenced 41 months) and *United States v. Scott Fairlamb*, 21-CR-120 (RCL) (defendant sentenced to 41 months). See ECF 110 at 35-37. Both of those cases remain good comparators to the defendants. However, another and much more recent comparator, is *United States v. Sparks*, 21-CR-87 (TJK). As with all January 6 cases, many salient differences explain the differing recommendations and sentences.[10] While no previously sentenced case contains the same balance of aggravating and mitigating factors present in Connell and Adams' case, Sparks conduct and the procedural posture of his case provide suitable comparisons to the relevant sentencing considerations in this case.

Sparks, like Connell and Adams, was extremely active on Facebook and used it to evince his intent in going to Washington. Sparks, unlike Connell and Adams, was much clearer about his violent intent before travelling hundreds of miles by car to Washington. But Connell and Adams, like Sparks, discussed their intent to go to Washington to "Stop the Steal" on January 6.

Sparks, Connell, and Adams approached the Capitol from the West Front, were the scene quickly descended into chaos. Despite clear signs of the riot unfolding around them, all three made their way underneath the scaffolding that had been built for the inauguration. Sparks, Connell and

---

[10] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Adams were on the Northwest Steps at the same time facing off against the same small group of

Capitol Police officers who were trying to hold rioters on the landing.

When Connell and Adams broke through the police line on the Northwest Steps, Sparks

was mere feet behind them and assisted them in breaking through the next police line at the top of

the steps. Like Connell and Adams, Sparks called the crowd on the Northwest Steps forward after

the police line fell. At the Senate Wing Door, Sparks climbed through a smashed window and was

the first rioter to enter the building. Connell and Adams, however, waited for rioters who had leapt

through the smashed windows to open the doors such that they were among the first members of

the mob to pass through the breached Senate Wing Door.

Unlike Connell and Adams, Sparks went deep into the Capitol Building and was part of

another stand-off with police. Sparks, like Adams, also obstructed the investigation and made

efforts to delete evidence and destroy the digital records of his crimes. In the immediate aftermath

of the riot, Sparks expressed pride in his conduct. Like Connell, he also stated a desire to return to

Washington to engage in further violence. Unlike Connell and Adams, Sparks took his case to trial

but did not testify.

Sparks' case is strikingly similar to Connell and Adams' case.  All three: 1) drove

hundreds of miles to participant in the events of January 6, 2) were present as the West Front

descended into a riot, 3) climbed through the scaffolding to get closer to the Capitol despite

chemical irritants and crowd control measures being used in that area, 4) overwhelmed the same

line of police officer on the Northwest Steps at nearly the same instant, 5) breached the Capitol

through the Senate Wing Door area seconds after the first breach of the building at the area, and

6) expressed pride in their conduct. Connell and Sparks both discussed returning to D.C. to engage in further violence. Adams and Sparks both also attempted to obstruct the FBI's investigation of their cases. On balance, the cases are far more similar than they are different. Judge Kelly found that the egregiousness Sparks' criminal conduct during the January 6 riot far exceeded his calculated guidelines range and, therefore, varied upward and sentenced Sparks to 53 months. Sparks—having been the first into the U.S. Capitol—deserved his just punishment. These defendants do so too.

## VI.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C.  § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence,"

§ 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted).

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[11]

Because the defendants in this case engaged in criminal conduct in tandem with hundreds

---

[11] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

of other defendants charged in other January 6 cases, and their criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendants responsible for their individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Connell and Adams to each pay $2,000 in restitution for their convictions. This amount fairly reflects their role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids

sentencing disparity.

**VII.    FINE**

The defendants' convictions for violations of 18 U.S.C. §§ 231(a)(3) and 111(a)(1) subject them to a statutory maximum fine of $125,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, the defendants' financial assets set forth in the PSR suggest that the defendants are unable, and are unlikely to become able, to pay a fine.

## VIII. CONCLUSION

For the reasons set forth above, the government requests that the Court sentence Cody Page Carter Connell and Daniel Page Adams to 51 months of incarceration, three years of supervised release, $2,000 in restitution, and a mandatory assessment of $360.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:    *s/ Sean P. McCauley*
SEAN P. McCAULEY
Assistant United States Attorney
New York Bar No. 5600523
United States Attorney's Office
For the District of Columbia
601 D Street, NW
Washington, DC 20530
Sean.McCauley@usdoj.gov